MC-275

Name  RICHARD SOTO

Address  C/O ASP, 650-2-33L

P.O. BOX 9

AVENAL, CA 93204-0009

CDC or ID Number  C-09455

*Fee Due*

FILED
CLERK U.S. DISTRICT COURT

APR 1 - 2009

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

## IN THE CALIFORNIA COURT OF APPEAL
### FOR THE SECOND APPELLATE DISTRICT

(Court)

RICHARD SOTO, IN PRO PER,
Petitioner

vs.

JAMES D. HARTLEY, WARDEN,
Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. CV09 2283 CAS (PJW)

*(To be supplied by the Clerk of the Court)*

### INSTRUCTIONS—READ CAREFULLY

- **If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.**

- **If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.**

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under rule 8.380 of the California Rules of Court [as amended effective January 1, 2007]. Subsequent amendments to rule 8.380 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved for Optional Use
Judicial Council of California
MC-275 [Rev. January 1, 2007]

**PETITION FOR WRIT OF HABEAS CORPUS**

Page 1 of 6
Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 8.380
www.courtinfo.ca.gov

American LegalNet, Inc.
www.FormsWorkflow.com

RECEIVED
U S DISTRICT COURT

MAR 3 1 2009

CENTRAL DISTRICT OF CALIFORNIA
DEPUTY

**This petition concerns:**

| | |
|---|---|
| ☐ A conviction | ☑ Parole |
| ☐ A sentence | ☐ Credits |
| ☐ Jail or prison conditions | ☐ Prison discipline |
| ☐ Other *(specify):* | |

1. Your name: **RICHARD SOTO**

2. Where are you incarcerated? **AVENAL STATE PRISON, AVENAL, CA**

3. Why are you in custody? ☑ Criminal Conviction  ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      **SECOND DEGREE MURDER**

   b. Penal or other code sections: **187**

   c. Name and location of sentencing or committing court: **LOS ANGELES COUNTY SUPERIOR COURT,**

   d. Case number: **A616196**

   e. Date convicted or committed: **09-06-79**

   f. Date sentenced: **10-03-79**

   g. Length of sentence: **15 YEARS TO LIFE**

   h. When do you expect to be released? **MEPD 05-29-89**

   i. Were you represented by counsel in the trial court? ☑ Yes.  ☐ No. If yes, state the attorney's name and address:

      **LOS ANGELES COUNTY PUBLIC DEFENDER**

4. What was the LAST plea you entered? *(check one)*

   ☐ Not guilty  ☑ Guilty  ☐ Nolo Contendere  ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury  ☐ Judge without a jury  ☐ Submitted on transcript  ☐ Awaiting trial

MC–275

6. **GROUNDS FOR RELIEF**

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(if you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

SEE ATTACHED PAGES.

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

SEE ATTACHED PAGES.

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

SEE ATTACHED PAGES.

**PETITION FOR WRIT OF HABEAS CORPUS**

7. **Ground 2 or Ground** _____ *(if applicable):*

SEE ATTACHED PAGES.

a. Supporting facts:

SEE ATTACHED PAGES.

b. Supporting cases, rules, or other authority:

SEE ATTACHED PAGES.

8. Did you appeal from the conviction, sentence or commitment?  ☐ Yes.  ☑ No.  If yes, give the following information:

   a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"): _____

   b. Result _____    c. Date of decision: _____

   d. Case number or citation of opinion, if known: _____

   e. Issues raised:  (1) _____

      (2) _____

      (3) _____

   f. Were you represented by counsel on appeal?  ☐ Yes.  ☐ No. If yes, state the attorney's name and address, if known:

      _____

9. Did you seek review in the California Supreme Court?  ☐ Yes  ☑ No.  If yes, give the following information:

   a. Result _____    b. Date of decision: _____

   c. Case number or citation of opinion, if known: _____

   d. Issues raised:  (1) _____

      (2) _____

      (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:

    N/A _____

    _____

11. Administrative Review:

    a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].)  Explain what administrative review you sought or explain why you did not seek such review:

    THERE IS NO AVAILABLE ADMINISTRATIVE REVIEW FOR THE REVERSAL BY GOVERNOR

    OF A PAROLE GRANT. _____

    _____

    _____

    _____

    _____

    _____

    b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
       *Attach documents that show you have exhausted your administrative remedies.*

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?   ☑ Yes. If yes, continue with number 13.   ☐ No. If no, skip to number 15.

MC–275

13. a.  (1) Name of court: LOS ANGELES COUNTY SUPERIOR COURT

     (2) Nature of proceeding (for example, "habeas corpus petition"): HABEAS CORPUS

     (3) Issues raised: (a) SAME AS RAISED HEREIN

         (b) _____

     (4) Result *(Attach order or explain why unavailable):* DENIED (SEE ATTACHMENT "A")

     (5) Date of decision: 02/18/2009

   b.  (1) Name of court: _____

     (2) Nature of proceeding: _____

     (3) Issues raised: (a) _____

         (b) _____

     (4) Result *(Attach order or explain why unavailable):* _____

     (5) Date of decision: _____

   c.  *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

N/A

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

N/A

16. Are you presently represented by counsel?   ☐ Yes.   ☑ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?   ☑ Yes.   ☐ No. If yes, explain:

I CURRENTLY HAVE A HABEAS PETITION PENDING IN THE FEDERAL COURTS
CHALLENGING A PRIOR PAROLE DENIAL.

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

N/A

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 3-29-09

▶ *Richard Soto*
(SIGNATURE OF PETITIONER)

## STATEMENT OF FACTS

1)     On 09-05-79, Petitioner pled guilty to one count of Second Degree Murder in the Los Angeles County Superior Court, Case No. A616196. (See Exhibit #1.)

2)     On 10-03-79, Petitioner was sentenced by the trial court to a term of imprisonment of 15 years-to-life. (See Exhibit #1.)

3)     On 10-12-79, Petitioner was received into the custody of the California Dept. of Corrections ("CDC"). (See Exhibit #2.)

4)     Petitioner's minimum eligible parole date ("MEPD") was set by the CDC at 05-29-89, pursuant to controlling statutes and administrative regulations in effect' at the time of Petitioner's offense. (See Exhibit #2.)

5)     CCR Title 15 §2402(c), which sets out the "Circumstances Tending to Show Unsuitability," lists the following factors tending to demonstrate an inmate is unsuitable for release on parole:

> "(1) Commitment Offense. The prisoner committed the offense in an especially heinous, atrocious or cruel manner. The factors to be considered are:
>
> (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
>
> (B) The offense was carried out in a dispassionate and calculated manner, such as an execution style murder.
>
> (C) The victim was abused, defiled or mutilated during or after the offense.

1

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) **Previous Record of Violence.** The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) **Unstable Social History.** The prisoner has a history of unstable or tumultuous relationships with others.

(4) **Sadistic Sexual Offenses.** The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) **Psychological Factors.** The prisoner has a lengthy history of severe mental disorders related to the offense.

(6) **Institutional Behavior.** The prisoner has engaged in serious misconduct in prison or jail." (emphasis added)

6)    CCR Title 15 §2402(d), which sets out the "Circumstances Tending to Show Unsuitability," lists the following factors tending to demonstrate an inmate is suitable for release on parole:

"(1) **No Juvenile Record.** The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm.

(2) **Stable Social History.** The prisoner has experienced reasonably stable relationships with others.

(3) **Signs of Remorse.** The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving the suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) **Motivation for Crime.** The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built up over a long period of time.

(5) **Battered Woman Syndrome....**

(6) **Lack of Criminal History.** The prisoner lacks any significant history of violent crime.

(7) **Age.** The prisoner's present age reduces the probability of recidivism.

(8) **Understanding and Plans for Future.** The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) **Institutional Behavior.** Institutional activities indicate an enhanced ability to function within the law upon release " (emphasis added)

7)     CCR Title 15 §2403(c), which sets out the recommended proportional base terms for persons convicted of Second Degree Murder, recommends a proportional base term of 19-20-21, which is the highest term the Board of Parole Hearings can impose on a person convicted of Second Degree Murder.

8)     The maximum recommended proportional base term in the Board's regulations for the most egregious, heinous, and/or callous instances of Second Degree Murder is 21 years.  (See CCR Title 15 §2403(c).)

9) Since coming into the custody of CDC, the Petitioner has received one (1) serious rules violation, which took place in June 2000, which disciplinary charge was unrelated to any force, violence, or drugs/alcohol.

10)     Since coming into the custody of CDC, the Petitioner has upgraded himself educationally, by obtaining a GED and an Associates Degree (See Exhibit #2), and vocationally, by completing vocational training programs in Information Technology and Programming and Graphic Arts  (See Exhibit #2).

11)     Since coming into the custody of CDC, the Petitioner has taken, completed, and/or participated in numerous self-help and therapy groups/programs, including, but not limited to: (1) Rational Behavior Training; (2) Alcoholics Anonymous; (3) Category "X" Program; (4) Process Oriented Non-Directive Psychotherapy; (5) Stress Management; (6) Square One Narcotics Anonymous; (7) Early Engagement Program; (8) Pre-Release Workshop; (9) CALM (Conflict/Anger-Lifelong Management); (10) Reducing Stress; (11) Relapse Prevention; (12) Anger and Communication; (13) Negative Emotion; (14) Problem Solving; (15) Family Matters; (16) Victim Awareness; (17) Rational Behavior; (18) Life Prisoners' Support Group.

12)     Since coming into the custody of CDC, the Petitioner has been the subject of at least sixteen (16) psychiatric and/or psychological evaluations, which have consistently held since 1982 that the Petitioner would pose a low risk of violence if he

were to be paroled, including:

     a) 08-17-82, by William Weathers, M.D., Staff Psychiatrist, who opined the following, in relevant part:

     "His potential for violence is considered average or below."

     b)    05-20-86, by Ralph Allison, M.D., Staff Psychiatrist, who opined the following, in relevant part:

     "He does not appear to be of any significant danger in the prison environment. There is no reason to believe he would be of any danger on the outside, again, with the usual assumptions that he avoid alcohol and intoxicating drugs."

     c)    07-07-87, CMC-E Psychiatric Council, who opined the following, in relevant part:

     "His current level of dangerousness is estimated to be at normal for society, and if paroled, he would continue to be no more dangerous than the average person in society."

     d)  01-14-88, by Jack Tolchin, Ph.D., Staff Psychologist, who opined the following, in relevant part:

     "It would appear that Mr. Soto has accomplished a total institutional adjustment and serious parole consideration is now in order."

     e)  03-27-89, by Grant Garlock, M.D., Staff Psychiatrist, who opined the following, in relevant part:

     "Violence potential within the institution is average or below and I would suspect that with therapeutic involvement, as he has now, it

will become even lower when he is paroled to the outside world."

f) 03-08-90, by Grant Garlock, M.D., Staff Psychiatrist, who opined the following, in relevant part:

"Violence potential is extremely low and impulse control is good in the institution and I feel that it would continue this way on the outside."

g) 01-03-91, by Ralph Allison, M.D., Senior Psychiatrist, who opined the following, in relevant part:

"I note in the Board of Parole Hearings report of April 1990 that one-on-one psychotherapy was mandated for this inmate by the Board of Parole Hearings. This is completely inappropriate as this man has never been found to have an emotional illness and, therefore, any such therapy would be useless as he has nothing to cure... He is well below average in dangerousness and there is no reason to expect that he will be any different were he to be paroled."

h) 01-18-91, by R.M. Anderson, Chief Psychiatrist, who stated the following, in relevant part:

"Further psychiatric involvement with this inmate cannot assist the Board in its deliberation.

"From a psychiatric standpoint, the inmate should be removed from the special calendar because psychopathology is no significantly related to future criminal behavior and psychiatric opinion will not

contribute to release decision."

i) 01-10-92, Psychiatric Council;

j) 02-11-94, by Clyde Martin, M.D., Staff Psychiatrist, who opined the following, in relevant part:

"...his violence potential outside a controlled setting in the past is considered to have been the same as the average inmate and is currently less...

k) 05-09-94, by Clyde Martin, M.D., Staff Psychiatrist.

l) 06-23-95, by Clyde Martin, M.D., Staff Psychiatrist, who opined the following, in relevant part:

"If he were to be considered for parole or release, his violence potential outside a controlled setting in the past is considered to have been about the same as the average inmate and is currently less..."

m) 07-22-96, by R. Sheldon, Senior Psychologist, who opined the following, in relevant part:

"If released into the community he should pose a low risk to the community."

n) 10-19-98, by R. Sheldon, Senior Psychologist, who opined the following, in relevant part:

"Assessment of Dangerousness

Not dangerous to others.

"Observations/Comments/Recommendations

7

He appears to be a low risk if paroled..."

o)    11-06-01, by Charles Silverstein, Ph.D., Psychologist, who opined the following, in relevant part:

"The inmate remains behaviorally and psychologically consistent with the findings of the past several BPT evaluation reports, which have described him as a relatively low risk for future violent behavior if released on parole."

p)    02-28-03, by Jeffrey Lille, Ph.D., Psychologist, who opined the following, in relevant part:

"The risk for future violence in the case of inmate Soto is low..."

q)    09-21-07, by Joe Reed, Ph.D., J.D., who opined the following, in relevant part:

"In light of all of the foregoing, his clinically estimated risk of violence within the community setting is in the low category as compared to US adult male offenders."

13)    Since coming into the custody of CDCR, the Petitioner has attended/been the subject of at least fourteen (14) Parole Consideration Hearings conducted by the Board of Parole Hearings, including:

- 09-13-86; parole denied for 1 year.

- 04-13-88; parole denied for 1 year.

- 04-05-89; parole denied for 1 year.

- 04-19-90; parole denied for 1 year.

- 04-04-91; parole denied for 1 year.

- 04-21-92; parole denied for 2 years.

- 08-25-94; parole denied for 1 year.

- 10-12-95; parole denied for 1 year.

- 10-22-96; parole denied for 2 years.

- 01-21-99; parole denied for 3 years.

- 03-04-02; stipulated parole denial for 1 year.

- 04-13-03; parole denied for 1 year.

- 01-27-05;  parole  GRANTED,  subsequently  REVERSED  by Governor.

- 10-25-07;  parole  GRANTED,  subsequently  REVERSED  by Governor (See Exhibits #2 and #3) (**NOTE**:  This is the parole hearing at issue in this Petition).

14)   At  the  time  of  the  Parole  Consideration  Hearing  of  10-25-07,  the Petitioner  had  served  in  excess  of  28  calendar  years  in  custody  on  this  conviction, without  the  calculation  of  pre-sentence  and  post-conviction  credits  to  which  the Petitioner  is  statutorily  entitled,  which  would  result  in  the  Petitioner  having  served  in

excess of 35 years in custody for a crime in which the Board's maximum recommended proportional base term is 21 years, resulting in the Petitioner's incarceration being greatly disproportional to his commitment offense.

At the Parole Consideration Hearing of 10-25-07, the Board of Parole Hearings panel found the Petitioner suitable for release on parole, and stated the following in their decision:

"PRESIDING COMMISSIONER PRIZMICH: Yeah, anytime. Okay, we're back on the record. The time is 1:35. In the matter of Richard Soto, CDC number C as in Charles, 09455, the Panel has reviewed all the information received from the public and relied on the following circumstances in concluding that the prisoner is suitable for parole, and would pose, and would not pose an unreasonable risk of danger to society or threat to public safety if released from prison.

We note that the prisoner has, in terms of his juvenile record, no assaults, no assaultive juvenile record. While in prison, we note that the prisoner has enhanced his ability to function within the law, and we note that he has received one 115 in all of his years in prison, which started 10/12/79, which is truly a remarkable record. In terms of the other items within prison, he has improved his educational, receiving an AA degree. He has continued for, I believe, in excess of 60 months now, AA and/or NA programs. The discussion with the commissioner revealed that he had a good grasp and understanding of the programs and more

importantly a great, a good insight into himself and the causative factors of his drinking and drugging, which enhanced his crimes, I believe, out in the street.

In terms of his vocational programming, I may be in error on this, but I believe he has two vocations, graphic arts and a vocation in computer skills. All of his institutional assignments have been rated as superior or excellent. Quite a few commentaries in the laudatory chronos that provide him with outstanding comments about his job performance, his dedication, and his willingness to work. In terms of another factor in proving his suitability for parole, we find that he has matured and has grown and has achieved a greater understanding of who he is, who he was, and hopefully who he will be in the future.

He has recently maintained a positive institutional behavior despite the fact he received a date once before. In terms of the Panel, we reviewed the file and there does not appear to be, which is understandable in many cases, but in this man's case, does not appear to be a turn away from what he needs to do and had continued his positive institutional behavior even in light of the fact that he received a date that was ultimately reversed. He certainly shows signs of remorse, coming to a place where he refers in a very honorable, appropriate way, refers to the victim, Mr. Gonzalez, as Javier. He comments, and believably comments on the, to the Panel was that he lives and thinks of Mr. Gonzalez virtually ever day and lives in honor and respect of his memory. In terms of his

psychological evaluation, 2007, from Dr. Reid, we find that evaluation as a positive evaluation.

The base term of confinement in this matter, the prisoner has been convicted of murder, and that's a Penal Code Section 187, and that murder occurred, bear with me, 3/31/1979. We find that falls under the, that murder was a second degree murder, I should note, that murder falls under Section 2403 subsection B, murder in the second degree, offense that was committed on or after 11/8/78. The Panel finds that category three, check that, category three C?

DEPUTY COMMISSIONER ARMENIA: Three C, three C, yeah.

PRESIDING COMMISSIONER PRIZMICH: Category three C was the most appropriate category, three being no prior relationship with the victim, and C being severe trauma. Certainly, the victim was beaten severely over a prolonged period of time. The Panel does find aggravation in that in terms of the beating, since it was so severe. The Panel assess 252 months for the base term of the offense. And as just mentioned, that is an aggravated base term. The aggravation was as a result of, the victim was particularly vulnerable due to his physical condition, there were several individuals that set upon him, including the inmate himself. His state of inebriation was apparently severe, so he was completely and wholly vulnerable in this case when he was beat literally to death.

12

The prisoner, also in terms of aggravation, the prisoner does have a history of criminal behavior prior to this offense, so we note that as an aggravating factor. During the commission of the crime, without question the prisoner had a number of opportunities to cease the savage beating of Mr. Gonzalez and chose not to and, in fact, was the instigator in much of the savagery here. So we find that there was certainly adequate circumstance for aggravating this case.

Continuing on this parole grant, the Panel finds that the total term calculation is as follows. The base life term, that is, the aggravated term is 252 months, as I've already mentioned. There aren't any additional terms adding to that, so the total term for base term is 252 months. And in terms of the post –conviction credits, that is, those credits that would detract, take away from those months, we note that there was one 115, which is a loss of four months of post-conviction credits. And we do note that the conviction time started 10/12/79 and the date of this hearing is 10/25/07. In terms of the calculation we find that there are 108 months of post-conviction credits, which equate to a total period of confinement as 144 months.

In terms of special conditions, the following are found as special conditions in this case that we wish to impose on parole. That the inmate not use or possess alcoholic beverages and submit to alcohol testing, submit to anti-narcotic testing, submit to THC testing, participate in substance abuse programming, such as AA or NA, report to parole

outpatient clinic for evaluation, attend a parole outpatient clinic.  We are encouraged by the fact that you have chosen a transitional housing and have a bed waiting for you, that's somewhat unusual, but we were encouraged by that fact.  I'm going to turn briefly to Mr. Armenta for --

**DEPUTY COMMISSIONER ARMENTA**:  We need to add that.

**PRESIDING COMMISSIONER PRIZMICH**:  Okay, go ahead. I'm going to turn it to you, you can say that at this point.

**DEPUTY COMMISSIONER ARMENTA**:   Okay,   one other condition that we are going to add is that you are not to associate with documented gang members, family or not family members, it doesn't make any difference.

**INMATE SOTO**:  Okay.

**DEPUTY COMMISSIONER ARMENTA**:  Okay.  Well, let me tell you something, sir.  And I'm sure you've heard it before and I'm sure that you know it already.   Your crime is one of those that shocks the conscience.   It was horrible, even when I was reading about it.  But you did not receive a sentence of life without the possibility of, you know, parole.   You did receive a sentence where you could get your parole. You've been coming to hearings for many, many years.  You've been denied for a year many, many times.  You've been told by us to do certain things, that it's not conceivable that you be ready for parole, and you come back in a year and you do everything that we tell you to do.  And then you come back and you again, same thing happens.

And it reaches the point where some people get very frustrated, and they start doing things. You haven't done anything wrong while in prison. You've done, you've done your programming, your conduct, your behavior, you can't fake it. And you're not involved in gangs inside the prison. There's nothing in your file, not even in your confidential, there's nothing that would say that. No one has, what I'm saying is that no one has ever said, even behind your back, that you're involved in something. So I'm very, I'm convinced that you are, that you are, that you have made that turn, that change. Yeah, there was a point where you were a threat and you were probably a very bad person. But at some point through the years, through the years of being here, your age, and your beliefs in Christianity, and your programming, you made that turn. And that's, and that's what I focused on.

And I'll tell you, my first reaction was to go for a year, but I really dug inside myself and thought about the fairness of going one more year. You've done everything that we ask you to do. And you got life with the possibility of parole, and I'll tell you again, you've done everything that we've asked you to do. And as far as your transition program home, that's good. Yes, you're not going to have a job. Most people that go into a transition program do not have a job, they're not supposed to have a job. They're supposed to go in there and they're going to try to work you out. Eventually you are going to have a job, and especially when you feel and they feel that you're ready to go live either with your sister or on your own

15

once you have a job.   I'm sure this program will not be throwing you out.

But besides that, you have the trainings.   And we can harp on that, yeah, we can harp on that, he don't have a job.   Well, you're not required to have a job, you've got the skills.   And then, well, he should have a job.   Well, yeah, he will once he gets through his transitional programming, and that's a real good step for you.   Okay, so good luck to you.

**INMATE SOTO**:   Thank you.

**PRESIDING COMMISSIONER PRIZMICH**:   Continuing, I just want to make absolutely sure that in terms of the special conditions of the parole that the transcriber adds to that that there will be no gang affiliation, whether that be a gang affiliation, known gang affiliation with relatives or friends, that that would also be a condition of parole that we would like to see. Sir, you have received a date before in the past so you know, you know what could happen.

We spoke long and hard about your case, but it's not only our decision.   This decision does go to a unit, as I explained earlier in the hearing, it's called the Decision Review Unit.   They'll make sure that what we've done has addressed all the, all the issues that we need. We believe we have, but they can reject it.   It then goes to the full Board of Parole Hearings, that they will review at a meeting held as a body.   It happens once a month.   They could reject.   It then goes to the Governor's Office for review, and he can reject, as you've experienced in the past.   So this

does not put an end to this.  This is certainly a wonderful first step in terms of your future, but it is not the end all, be all with regard to this.

The other item that I wish to admonish and warn you of, I don't know if anybody has done this in the past, but your cellmates, your peers, your inmates, friends or non-friends, out there, you should keep the fact that you got a date close to your vest.   The reason I say that, in the past there has been situations where inmates have received dates and for whatever reason, whether it be jealousy, whether it be retribution, whatever the reason, some other inmates have set them up for 115s or other situations which obviously create enormous problems with the date itself.   So that's something we caution you about.  Certainly your sharing this with your family is up to you, sir.   Certainly with regard to your religious commitment, that's something you thank your Lord for, and give Him, give Him the credit for the work that He has helped you get through. You've done the work, but He's helped you.

INMATE SOTO:  Yes.

PRESIDING COMMISSIONER PRIZMICH:   So, sir,  we wish you luck.   You have received a date.   You've done the work, so you're to congratulate yourself in this manner.   So this hearing is now closed.   The time is 1:51.  And congratulations, sir, and we wish you luck.

DEPUTY COMMISSIONER ARMENIA:   Can I add one more thing?

PRESIDING COMMISSIONER PRIZMICH:  Sure

**DEPUTY COMMISSIONER ARMENIA**: As far as a relapse program, it's great to have one, and in hearing you, you do have one, you stay in touch with your people, and you get in touch with AA and NA out there, and as soon as you get out, there's a lot of clubs out there, a lot of meetings. It's nothing like, you know, you're going to be lost. There's a lot of meetings. Okay, and also, you should feel good about the fact that on this Panel, you probably got over 40 to 50 years of, of our years in criminal justice. Okay, so good luck to you.

**INMATE SOTO**: Thank you very much.

**PRESIDING COMMISSIONER PRIZMICH**: I'm going to reset the time here. The time of the close of this hearing is now 1:52. Good luck, sir.

**INMATE SOTO**: Okay, thank you. God bless you." (See Exhibit #2 @ pp. 89-99.)

15) On March 13th, 2008, the Board of Parole Hearings reviewed and approved the Petitioner's parole grant. The final approval date for the parole grant was set at February 22nd, 2008. (See Exhibit #4.)

16) On March 21st, 2008, the Governor of California exercised his discretion and REVERSED the Petitioner's parole grant by the Board of Parole Hearings, in which the Governor relied exclusively upon the Petitioner's commitment offense in finding him unsuitable for release on parole. (See Exhibit #5.)

18

ARGUMENT

&

MEMORANDUM OF POINTS AND AUTHORITIES

I.

THE DECISION BY THE GOVERNOR TO REVERSE
THE PETITIONER'S PAROLE GRANT
BY THE BOARD OF PAROLE HEARINGS
VIOLATED PETITIONER'S DUE PROCESS
RIGHTS, AND WAS NOT SUPPORTED
BY "SOME EVIDENCE"

A.

Article V, Section 8(b), of the California Constitution, grants the Governor the authority to review the Board's parole decisions to grant or deny a parole release date to a person convicted of murder, but it "does not grant a Governor unfettered discretion over parole matters, but rather explicitly requires his or her parole decision to be based on the same factors that the Board is required to consider." (See In re Rosenkrantz (2002) 29 Cal.4th 616, 626, @ pp . 625-26.)

While the California Supreme Court upheld the Court of Appeals ruling issued in In re Ramirez in their Rosenkrantz decision, the California Supreme Court issued a decision in the case of In re Dannenberg (2005) 34 Cal.4th 1061, where they disapproved of the Court of Appeals ruling in Ramirez so far as it required the Board of Parole Hearings, subsequently renamed the Board of Parole Hearings, and therefore the Governor since he/she is limited to considering the same information as considered by the B.P.H., to conduct a comparison of like/similar crimes to those under considera-tion, and set a requirement that the Board, and therefore the Governor, must only demonstrate how an inmate's particular offense is more violent or aggravated than the

minimum necessary to sustain the conviction(s) under consideration.

Furthermore, both the sate and federal courts have issued numerous decisions defining the constitutional standards by which the Governor and the B.P.H. must comply when conducting and/or reviewing Parole Consideration Hearings and/or parole grants: (1) In re Lawrence, 44 Cal.4th 1181 (2008); (2) In re Rosenkrantz, 29 Cal.4th 616 (2002); (3) In re Smith, 109 Cal.App.4th 489 (2003); (3) In re Smith, 114 Cal.App.4th 343; (4) In re Ramirez, 94 Cal.App.4th 549 (2001); (5) In re Dannenberg, 34 Cal.4th 1061 (2005); (6) In re Scott, 133 Cal.App.4th 573 (2005); (7) In re Lee, 143 Cal.App.4th 1400 (2006); (8) In re Elkins, 144 Cal.App.4th 475 (2006); (9) In re Singler (2008) 2008 DJDAR 4194; (10) Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2008); (11) Martin v. Marshall, 431 F. Supp. 2d 1038 (N.D.Cal. 2006). As articulated in Lee, supra, 143 Cal.App.4th 1400, these decisions conclude that "[s]ome evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." (Id. at p. 1409, fn. omitted.)

The California Supreme Court has held that to ensure that a Board's decision comports with due process, a court must consider whether "some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (Rosenkrantz, supra, 29 Cal.4th at p. 658, italics added.)

Indeed, the California Supreme Court's conclusion that current dangerousness (rather than the mere presence of a statutory unsuitability factor) is the focus of the parole decision is rooted in the governing statute. The California State Supreme Court have observed that " '[t]he Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.)'" (*Rosenkrantz*, *supra*, 29 Cal.4th p. 683.) Consistent with this statutory regime, the Board's regulations, establishing a matrix of factors for determining the suggested base terms for life prisoners, contemplates that even those who committed aggravated murder may be paroled after serving a sufficiently long term if the Board determines that evidence of postconviction rehabilitation indicates they no longer pose a threat to public safety. (See, e.g., Regs., §§ 2282(b), 2403(b)) [formulating longer suggested base terms for first degree murderers who have no prior relationship to their victim and who inflict trauma on their victims].) Of course, as we stated in *Dannenberg*, the statute does not contemplate that the goal of uniformity will take precedence over the goal of public safety. (See *Dannenberg*, *supra*, 34 Cal.4th at p. 1087.) But the statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder means that, particularly after these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone **rarely** will provide a valid

basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness.

In _Lawrence_, supra, the California Supreme Court explicitly held that under the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public.

"In Superintendent, Mass. Correc. Inst. v. Hill, the Supreme Court held that 'revocation of _good time_ does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by _some evidence_ in the record.' 472 U.S. 445, 454 (1985), _quoting_ Wolff v. McDonnell, 418 U.S. 539, 558 (1974)." Sass v. California Board of Parole Hearings, 461 F.3d 1123, 1128 (9th Cir.2006) (italics added). The Ninth Circuit has held that this same standard also extends to parole determinations. Hayward v. Marshall, ___ F.3d ____, 2008 WL 43716 *5 (9th Cir.2008), _citing_ Irons v. Carey, 505 F.3d 846, 851 (9th Cir.2007), _quoting_ Hill, 472 U.S. at 457 ("We have held that 'the Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due process with respect to this interest if the board's decision is not supported by 'some evidence in the record,' or is 'otherwise arbitrary.'"). In assessing "whether a state parole board's [or Governor's] suitability determination was supported by 'some evidence' in a habeas case, our analysis is framed by the statutes and regulations governing parole suitability

determinations in the relevant state." Hayward, 2008 WL 43716 *5, *quoting* Irons, 505 F.3d at 851. Here, the Court must look to California law and review the record. In reviewing the record and determining whether the "some evidence" standard is met, the Court need not examine the entire record, independently assess the credibility of witnesses, or re-weigh the evidence. Sass, 461 F.3d at 1128.

The controlling administrative regulations that must be complied with by both the Governor and the Board of Parole Hearings are set out in CCR Title 15 §2000 et seq., with the specific regulations relating to the Petitioner's particular type of offense being set out in CCR Title 15 §2400 et seq. According to the applicable regulation, as set out in CCR Title 15 §2402(c), which set out circumstances that tend to show that a prisoner is unsuitable for release on parole are that the prisoner (1) committed the offense in an especially heinous, atrocious or cruel manner [fn. omitted]; (2) possesses a previous record of violence; (3) has an unstable social history; (4) previously has sexually assaulted another in a sadistic manner; (5) has a lengthy history of severe mental problems related to the offense; and (6) has engaged in serious misconduct while in prison. (See CCR Title 15 §2402(c).)

The controlling administrative regulations set out in CCR Title 15 §2402(d), which set forth the circumstances tending to show a prisoner is suitable for release on parole are that the prisoner (1) does not possess a record of violent crime committed while a juvenile; (2) has a stable social history; (3) has shown signs of remorse; (4) committed the crime as a result of significant stress in his life, especially if the stress has built up over a long period of time; (5) committed the offense as a result of battered woman syndrome; (6) lacks any significant history of violent crime; (7) is of an age that reduces

the probability for recidivism; (8) has made realistic plans for release or has developed marketable skills that can be put to use upon release; and (9) has engaged in institutional activities that indicate an enhanced ability to function within the law upon release. (See CCR Title 15 §2402(d).)

The regulations noted above explain that the foregoing circumstances "are set forth as general guidelines; the importance attached to any circumstance or combination of circumstances in a particular case is left to the judgment of the panel." (See CCR Title 15 §§2402(c), (d).) In sum, the governing statute requires that the Board of Parole Hearings, and therefore the Governor due to the fact that he is limited to considering the same criteria that are to be considered by the Board of Parole Hearings, must grant a prisoner release on parole unless it determines that public safety requires a more lengthy period of incarceration for the individual because of the gravity of the offense underlying the conviction. (See In re Rosenkrantz, supra, @ pp. 653-54.)

California courts have made clear that the "findings that are necessary to deem a prisoner unsuitable for parole," Irons, 505 F.3d at 851, 2007 WL 2927359, at *3, are not that a particular factor or factors indicating unsuitability exist, but that a prisoner's release will unreasonably endanger public safety. In re Dannenberg, 156 Cal.App.4[th] 1387, 68 Cal.Rptr.3d 188, 2007 WL 3408290, at *9 (Cal.Ct.App. 2007), modified, 2007 Cal. App. LEXIS 1985, 2007 WL 4227229 (Cal.Ct.App. Dec. 3, 2007); In re Lee, 143 Cal.App.4[th] 1400, 1408, 49 Cal. Rptr.3d 931 (Cal.Ct.App. 2006); In re Scott, 133 Cal.App.4[th] 573, 595, 34 Cal.Rptr.3d 905 (Cal.Ct.App. 2005); see Cal. Penal Code § 3041(b) (providing that the Board "shall set a release date unless . . . consideration of the public safety requires a more lengthy period of incarceration for this individual").

Thus, for this Honorable Court the purpose, then, "[t]he test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety." Lee, 143 Cal. App.4[th] at 1408 (citations and footnote omitted); see also In re Elkins, 144 Cal.App.4[th] 475, 499, 50 Cal.Rptr.3d 503 (Cal.Ct.App. 2006) (holding that the "governor, in reviewing a suitability determination, must remain focused . . . on facts indicating that release currently poses 'an unreasonable risk of danger to society' " (citing Cal. Code Regs. tit. 15, §2402(a)));Scott, 133 Cal.App.4[th] at 591 ("The factor statutorily required to be considered, and the overarching consideration, is 'public safety.'" (citing Cal. Penal Code § 3041(b))).

**B.**

Both the Board and the Governor have broad discretion in parole matters, but "the requirement of procedural due process embodied in the California Constitution... places some limitations" upon those discretionary powers.  (See In re Rosenkrantz, supra, @ p. 655.)  "Although article V, section 8(b) [of the California Constitution] confers upon the Governor discretion regarding the manner in which to weigh the constitutionally specified factors, and authorizes the Governor to exercise judgment in reaching a decision, the voters in adopting the constitutional provision placed substantive limitations upon the Governor's exercise of that judgment and discretion. The provision mandates that the Governor consider only the same factors that may be

considered by the Board... Because this requirement gives rise to a liberty interest protected by due process of law, and because due process requires that a decision considering such factors be supported by some evidence in the record, the Governor's decision is subject to judicial review to ensure compliance with this constitutional mandate." (See In re Rosenkrantz, supra, @ pp. 663-64.) (emphasis added)

The California Supreme Court held that a parole decision by the Governor or the Board of Parole Hearings without any evidentiary support is arbitrary and capricious. (See In re Rosenkrantz , supra, @ p. 665.) In California, parole determinations are to be based on a prisoner's current and future parole risk. (See Cal. P.C. §3041.)


**C.**

In reversing the Board of Hearings' second GRANT of Parole for the Petitioner, the Governor gave several "reasons," which the Governor mistakenly believes or claims justifies the REVERSAL of Petitioner's parole grant, including: (1) Petitioner's prior criminality; (2) Petitioner's gang membership; (3) Petitioner's commitment offense; and (4) Petitioner's lack of a confirmed job offer; The Petitioner will individually address each of the "reasons" given by the Governor in an attempt to justify his REVERSAL of Petitioner's parole grant by the Board of Parole Hearings:


**(1)     Petitioner's Prior Criminality:**

The Governor attempts to use the Petitioner's pre-incarceration as justification supporting his REVERSAL of the Parole Board's parole release rant for the Petitioner. While the criminal history that the Governor recited is accurate, the Governor abjectly

failed to in any way demonstrate how the Petitioner's criminal history, which took place more than 28 years ago, would make the Petitioner's parole release posing an unreasonable risk to public safety, which is the requirement that he must comply in order to comply with the due process rights of the Petitioner. The Governor showed no nexus between the Petitioner's prior criminal record and his current parole suitability or unsuitability.

Thus, as to this reason used by the Governor to justify his REVERSAL of the Board of Parole Hearing's parole grant for the Petitioner, this factor is not supported by some evidence, pursuant to the binding case-law noted above, in violation of Petitioner's due process rights.

**(2)      Petitioner's Prior Gang Membership:**

The Governor attempts to use the Petitioner's prior gang membership, which is also more than 28 years removed, as a justification to his REVERSING of the parole grant by the Board of Parole Hearings.  However, as he failed to do relating to the Petitioner's criminal history, the Governor again failed to demonstrate any nexus between the Petitioner's gang membership and the Petitioner's current parole suitability or unsuitability.  He abjectly failed to demonstrate in any manner how the Petitioner's gang history, more than 28 years removed, would result in the Petitioner posing an unreasonable risk to public safety if he were to be paroled at this time, which is the requirement that he must comply in order to comply with the due process rights of the Petitioner.

Thus, as to this reason used by the Governor to justify his REVERSAL of the Board of Parole Hearing's parole grant for the Petitioner, this factor is not supported by some evidence, pursuant to the binding case-law noted above, in violation of Petitioner's due process rights.

### (3)    Petitioner's Commitment Offense:

The Governor next attempts to use the circumstances of the Petitioner's commitment offense as justification for his REVERSAL of the Petitioner's parole grant by the Board of Parole Hearings. The Governor again abjectly failed to demonstrate any nexus between the Petitioner's commitment offense and his current parole suitability or unsuitability. The Governor abjectly failed to demonstrate how any circumstance of the Petitioner's offense would have a negative impact upon his current parole suitability, and would result in the Petitioner posing an unreasonable risk to public safety if he were released on parole at this time, which is the requirement that he must comply in order to comply with the due process rights of the Petitioner.

Procedural due process requires that when the BPH's or Governor's finding of parole unsuitability is based upon factors relating to an inmate's commitment offense(s), the BPH/Governor must demonstrate how the factors in question negatively impact on the prisoner's current parole suitability, (See Hayward v. Marshall, 512 F.3d 536 (9th Cir. 2008); Dunn v. United States Parole Commission, 818 F.2d 742,754 (10th Cir. 1987); Phifer v. Clark, 115 F.3d 497 (7th Cir, 1997); In re Minnis, 7 Cal.3d @ p. 693 (1972); In re Seabock, 140 Cal.App.3d 29 (1983); In re Johnson, 35 Cal.App.4th 160 (1995); In re Scott (2005) 133 Cal.App.4[th] 573; In re Elkins (2006) 144 Cal.App.4[th] 475; In re Lee

(2006) 143 Cal.App.4[th] 1400.) The commitment offense and other pre-sentence factors will never change. When the BPH/Governor denies parole suitability based upon these static and unchanging factors without regard to current parole suitability, the Parole Hearing or Review, and any finding or decision reached therein, are procedurally defective. (See In re Minnis, supra.) The decision/finding of parole unsuitability by the Board of Parole Hearings or Governor not factually supported by factors relating to a commitment offense, and other pre-sentence factors, DOES NOT satisfy the requirements of individualized treatment and due consideration of a prisoner's application for release on parole. (Id.) The Governor abjectly failed to constructively demonstrate any evidence bearing some indicia of reliability, or factually advance even one factor pertaining to the commitment offense and/or other pre-sentence factors which would negatively impact upon the Petitioner's current parole suitability. (See Superintendent v Hill, 472 U.S. @ p. 455; adopted by the California Supreme Court in In re Powell, supra, @ p. 904.)

On judicial review, courts have held that when a parole board decision is based upon the commitment offense, and there are no other factors in evidence with which to factually demonstrate a current parole risk, as is the case here, "that finding and decision is procedurally insufficient and a punitive measure which does exceed the Board's authority." (See Dunn, supra, @ pp. 742-45 [requiring reversal of any parole board finding or decision reached in violation of procedural due process (quoting In re Greenwood, 87 Cal.App.3d @ p. 77; In re Powell supra, @ p.894)].)

The California Courts have issued several decisions over the recent years defining the constitutional standards by which the Parole Board must comply when

conducting Parole Consideration Hearings, including: (1) In re Lawrence, 44 Cal.4th 1181 (2008); (2) In re Rosenkrantz, 29 Cal.4th 616 (2002); (3) In re Smith, 109 Cal.App.4th 489 (2003); (3) In re Smith, 114 Cal.App.4th 343; (4) In re Ramirez, 94 Cal.App.4th 549 (2001); (5) In re Dannenberg, 34 Cal.4th 1061 (2005); (6) In re Scott, 133 Cal.App.4th 573 (2005); (7) In re Lee, 143 Cal.App.4th 1400 (2006); (8) In re Elkins, 144 Cal.App.4th 475 (2006); (9) In re Singler (2008) 2008 DJDAR 4194.

The California Supreme Court in In re Rosenkrantz, supra, and In re Dannenberg, supra, held that when a parole applicant's commitment offense(s), and the circumstances related thereto could not "reasonably" be considered "more aggravated or violent than the minimum necessary to sustain a conviction for the offense" a denial of parole under those circumstances would be "inconsistent with the statutory requirement that a parole date normally shall be set," and would be a violation of a prisoner's due process rights.  Furthermore, as expressly stated in *Rosenkrantz*, supra, "[T]he governing statute provides that the Board *must* grant parole *unless* it determines that *public safety* requires a lengthier period of incarceration for the individual because of the gravity of the offense underlying the conviction. (Pen. Code, § 3041, subd. (b).) And as set forth in the governing regulations, the Board *must* set a parole date for a prisoner unless it finds, in the exercise of its judgment after considering the circumstances enumerated in section 2402 of the regulations, that the prisoner is unsuitable for parole. Accordingly, parole applicants in this state have an expectation that they will be granted parole unless the Board finds, in the exercise of its discretion, that they are unsuitable for parole in light of the circumstances specified by statute and

by regulation." (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 654, italics added. See also *In re Smith* (2003) 114 Cal.App.4th 343, 366) ["parole is the rule, rather than the exception"].)

The California Supreme Court has held that to ensure that a Board's decision comports with due process, a court must consider whether "some evidence in the record before the Board supports the decision to deny parole, based upon the factors specified by statute and regulation. If the decision's consideration of the specified factors is not supported by some evidence in the record and thus is devoid of a factual basis, the court should grant the prisoner's petition for writ of habeas corpus and should order the Board to vacate its decision denying parole and thereafter to proceed in accordance with due process of law." (*Rosenkrantz*, *supra*, 29 Cal.4th at p. 658, italics added.)

Indeed, the California Supreme Court's conclusion that current dangerousness (rather than the mere presence of a statutory unsuitability factor) is the focus of the parole decision is rooted in the governing statute. The California State Supreme Court have observed that " '[t]he Board's authority to make an exception [to the requirement of setting a parole date] based on the gravity of a life term inmate's current or past offenses should not operate so as to swallow the rule that parole is 'normally' to be granted. Otherwise, the Board's case-by-case rulings would destroy the proportionality contemplated by Penal Code section 3041, subdivision (a), and also by the murder statutes, which provide distinct terms of life without possibility of parole, 25 years to life, and 15 years to life for various degrees and kinds of murder. (Pen. Code, § 190 et seq.)'" (*Rosenkrantz*, *supra*, 29 Cal.4th p. 683.) Consistent with this statutory regime, the Board's regulations, establishing a matrix of factors for determining the suggested

base terms for life prisoners, contemplates that even those who committed aggravated murder may be paroled after serving a sufficiently long term if the Board determines that evidence of postconviction rehabilitation indicates they no longer pose a threat to public safety. (See, e.g., Regs., §§ 2282(b), 2403(b)) [formulating longer suggested base terms for first degree murderers who have no prior relationship to their victim and who inflict trauma on their victims].) Of course, as we stated in *Dannenberg*, the statute does not contemplate that the goal of uniformity will take precedence over the goal of public safety. (See *Dannenberg*, *supra*, 34 Cal.4th at p. 1087.) But the statutory and regulatory mandate to normally grant parole to life prisoners who have committed murder means that, particularly after these prisoners have served their suggested base terms, the underlying circumstances of the commitment offense alone **rarely** will provide a valid basis for denying parole when there is strong evidence of rehabilitation and no other evidence of current dangerousness.

In *Lawrence*, supra, the California Supreme Court explicitly held that under the statute and the governing regulations, the circumstances of the commitment offense (or any of the other factors related to unsuitability) establish unsuitability if, and only if, those circumstances are probative to the determination that a prisoner remains a danger to the public. It is not the existence or nonexistence of suitability or unsuitability factors that forms the crux of the parole decision; the significant circumstance is how those factors interrelate to support a conclusion of current dangerousness to the public.

Pursuant to CCR Title 15 §2403(c), which sets out the recommended proportional base terms for persons convicted of Second Degree Murder, the recommended proportional base term for the Petitioner's particular type of offense is 19-

20-21 years. At the time of the Parole Consideration Hearing at issue herein, the Petitioner had served in excess of the maximum proportional base term for any type of Second Degree Murder, as set out in the administrative regulations. Thus, the Petitioner's sentence has now become disproportionate to his particular offense.

As has been held by the U.S. Court of Appeals for the Ninth Circuit and the U.S. District Courts for the Northern District of California, the Central District of California, and the Eastern District of California, the continued reliance by the Parole Board or Governor upon the static, unchanging factors of an inmate's offense and other pre-conviction factors to justify the continued denial of parole to which California inmates have a protected liberty interest, violates a prisoner's due process rights and liberty interests. (See Biggs v. Terhune, 334 F.3d 910 (9th Cir. 2003); Hayward v. Marshall, 513 F.3d 536 (9th Cir. 2008); Martin v. Marshall, 431 F.Supp.2d 1038 (N.D.Cal. 2006). Sprinkle v. Carey, 2008 U.S. Dist. Lexis 15172 (E.D.Cal. 2008); Trunzo v. Ornoski, U.S. Dist. Lexis 25089 (N.D.Cal. 2008); Pearson v. Muntz, 2008 U.S. Dist. Lexis 27910 (C.D.Cal. 2008).)

In the Biggs' ruling, the 9th Circuit opened the door for discussion and adjudication of the question of when, and at what point, does the nature and gravity of a prisoner's offense, conduct prior to imprisonment, criminal history and, by implication, other static/unchanging factors, cease to become relevant to the inquiry of risk to public safety and a sufficient evidentiary basis to continue to justify the denial of a parole release date to a prisoner. Although the Circuit Court itself did not directly address the matter, except to provide guidance and intent, the question of when such factors become irrelevant to the granting or denial of parole is a very important issue involving a

prisoner's liberty interest in parole, and his due process protections. The implication by the Ninth Circuit is clear, in that at some point in time, the factors relating to a prisoner's offense, prior conduct, and criminal history will cease to be a sufficient evidentiary basis in which to continue to justify the ongoing denial of parole.

The Ninth Circuit's ruling in <u>Biggs</u> was recently further articulated by the United States Court of Appeals for the Ninth Circuit in <u>Hayward v. Marshall</u>, where the court made it clear that "In some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes. The commitment offense can negate suitability only if circumstances of the crime reliably established by evidence in the record rationally indicate that the offender will present an unreasonable public safety risk if released from prison." (<u>Id.</u>)

Further, a recent ruling issued by the U.S. District Court for the Northern District of California *further* articulated the holding of Biggs, supra, in which the District Court specifically held that "Sole reliance on circumstances of petitioner's offense and conduct prior to the offense in denying parole constituted a due process violation." (See <u>Martin v. Marshall,</u> 431 F.Supp.2d @ HN#10(N.D.Cal.2006),)

In the instant case, the Governor cited no post-conviction evidence that would tend to demonstrate an unreasonable threat to public safety if he were released on parole, which is what the Board or Governor must do when denying a parole release date. (See <u>In re Lee</u>, 143 Cal.App.4th 1400 (2006).)

The Petitioner has attended numerous Parole Hearings where the factors of the commitment offense, and other pre-sentence factors, which have been repeatedly used

by the Parole Board as the primary justification to deny Petitioner a parole release date. However, in the case of two Parole Hearings, including the one at issue herein, the Petitioner was granted a parole date by the Hearing Panel, only to have the Parole Grant subsequently REVERSED by the Governor, based exclusively upon pre-commitment factors. The Governor abjectly failed to introduce any post-conviction evidence that demonstrates in any manner that the Petitioner would pose a threat to public safety if he were to be paroled at this time.

Although the Petitioner readily admits to his culpability for his actions in the offenses for which he is currently imprisoned, his crimes, and his culpability therein, are no more aggravated or violent than the minimum necessary to sustain his conviction, especially when you consider the fact that the Petitioner has now served a prison term in excess of that recommended for First Degree Murders.  The Governors zealous and continued reliance upon these unchanging factors, more than 28 years after the fact, clearly distorts the law, and has resulted in the swallowing of the mandate that parole shall normally be granted. Thus, the Petitioner's sentence has now been turned into a de facto life without parole. (See Hayward, supra; Martin, supra.)

Based upon the foregoing, the actions of the Governor,  were arbitrary, capricious, and were not supported by "some evidence." Here the Board did nothing more than give the Petitioner a pro forma review at which he recited post hoc rationalizations for a decision already made to REVERSE the Petitioner's parole grant.

Thus, as to this reason used by the Governor to justify his REVERSAL of the Board of Parole Hearing's parole grant for the Petitioner, this factor is not supported by some evidence, pursuant to the binding case-law noted above, in violation of

Petitioner's due process rights.


**(4)**     <u>**Lack of Confirmed Job Offer:**</u>

    The Governor's use of the Petitioner's lack of a confirmed job offer as further justification in his REVERSAL of Petitioner's parole grant is violative of the exact regulations that he is mandated by law to comply with. There is no mandate in CCR Title 15 that an inmate is required to have a verified job offer before he can be released on parole. In fact, the only requirement that needs to be met by the inmate to be considered a factor tending to indicate suitability for release on parole is that the inmate have marketable skills that can be put to use upon release, or has made realistic plans for release, which, even as was recognized by the Governor, the Petitioner has done. Therefore, the Governor's use of the Petitioner's lack of a confirmed job offer is violative of the administrative regulations by which the Governor must comply, and is violative of Petitioner's due process rights because his lack of a confirmed job offer was not demonstrated by the Governor to have an adverse impact upon the Petitioner's current parole suitability or his threat to public safety if he were released on parole.

## II.

## THE GOVERNOR VIOLATED PETITIONER'S FEDERAL DUE PROCESS RIGHTS AS THE FINDING AND/OR DECISION REACHED WAS MADE BY A PARTIAL FACT-FINDER WHOSE DECISION WAS ARBITRARY AND CAPRICIOUS, AND WAS NOT SUPPORTED BY "SOME EVIDENCE"

California's parole scheme gives rise to a constitutionally protected liberty interest in release on parole. (See McQuillion v. Duncan, 306 F.3d 895, 902 (9th Cir. 2002); Jancsek v. Oregon Bd. of Parole, 833 F.2d 1389, 1390 (9th Cir. 1987); Greenholtz v. Inmates of Nebraska Penal & Correctional Complex, 442 U.S. 1 (1979); Biggs v. Terhune, 334 F.3d 910, 915 (9th Cir. 2003); In re Rosenkrantz, 29 Cal.4th 616 (2003).)

Therefore, Petitioner is entitled to the process outlined in Greenholtz , viz., notice, opportunity to be heard, a statement of reasons for decision, and limited right to call and cross-examine witnesses. The finding/decision made by the Governor that Petitioner is unsuitable for parole, and would pose a threat to society if paroled, must be supported by some evidence bearing some indicia of reliability. While there always will be "some evidence" that can be used to explain a denial of parole, or, as is the case here, the reversal of a parole grant, federal due process requires more.

These guarantees do not exhaust Petitioner's right to due process. The fundamental core of due process is protection against arbitrary action on the part of the State:

"The principle and true meaning of the phrase has never been more tersely or accurately stated than by Mr. Justice Johnson in Bank of Columbia v. Okely, 17 U.S. 235, 4 Wheat. 235-244, 4 L.Ed. 449 [(1819)}: "As to the words from Magna Charta, incorporated into the Constitution of Maryland, after volumes spoken and written with a view to their exposition, the good sense of mankind has at least settled down to this: that they were intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice,"

(See Hurtado v. California, 110 U.S. 516, 527 (1884).) "The concessions of Magna Charta were wrung from the King as guarantees against the oppressions and usurpations of his prerogative." (Id. @ 531.) "The touchstone of due process is protection of the individual against arbitrary action of government." (See Wolff v. McDonnell, 418 U.S. 539, 558 (1974); citing Dent v. West Virginia , 129 U.S. 114 (1889).)

A government official's arbitrary and capricious exercise of his or her authority violates the essence of due process, contrary to centuries of Anglo-American jurisprudence. (See Yick v. Hopkins , 118 U.S. 356, 369 (1886); United States v. Lee, 106 U.S. 196, 220 (1882) ("No man in this country is so high that he is above the law. No officer of the law may set that law at defiance with impunity. All of the officers of the government from the highest to the lowest, are creatures of the law and are bound to obey it. It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives."); U.S. v. Nixon, 418 U.S. 683, 695-96 (1974); Accardi v. O'Shaughnessy, 347 U.S. 260, 267-68 (1954).)

Concomitant to the guarantee against arbitrary and capricious state action is the right to a fact-finder who has not predetermined the outcome of a hearing. (See Withrow v. Larkin, 421 U.S. 35 (1975) (a fair trial in a fair tribunal is a basic requirement of due process, and this rule applies to administrative agencies which adjudicate as well as to the courts); Edwards v. Balisok 520 U.S. 642 (1997); Bakalis v. Golembeski, 35 F.3d 318, 326 (7th Cir. 1994) (a decision-making body "that has prejudged the outcome cannot render a decision that comports with due process").)

Courts too numerous to list have recognized that the right to a disinterested decision-maker, who has not prejudged the case, is part of the fundamental guarantee against arbitrary and capricious government action in the California parole context. (See, e.g., In re Rosenkrantz (2003) 29 Cal.4th @ 677 (parole decision "must reflect an individualized consideration of the specified criteria and cannot be arbitrary or capricious"); In re Ramirez (2001) 94 Cal.App.4th 549, 563 ("some evidence" standard is "only one aspect of judicial review for compliance with minimum standards of due process" (citing Balisok) and Board violates due process if its decision is "arbitrary and capricious"); In re Minnis (1972) 7 Ca1.3d 639 (blanket no-parole policy as to certain category of prisoners is illegal); In re Morrall (2003) (same).) The guarantee of neutral parole officials in a suitability hearing is just as fundamental as the right to a neutral judge in a court proceeding.

The Ninth Circuit has previously acknowledged California inmates' due process right to parole consideration by neutral decision-makers.  (See O'Bremski *v. Haas*, 915 F.2d 418, 422 (9th Cir. 1990).)   The requirement of an impartial decision-maker transcends concern for diminishing the likelihood of error. As the U.S. Supreme Court held in Balisok , a decision made by a partial fact-finder who has predetermined the outcome is **per se** invalid -- even where there is ample evidence to support it.

The requirement of due process applies equally to the Governor's review of parole decisions made by the Board of Parole Hearings, as the courts have clearly held that the Governor is obligated to comply with the same regulations as the Board of Parole Hearings is obliged to follow, and this includes a prisoner's due process rights.

In the instant Petition, the Petitioner has been granted a parole release date by the Board of Parole Hearings on 2 occasions. Both times, the Governor of California has REVERSED the Petitioner's parole grants.  The decision by the Governor to REVERSE the Petitioner's parole grant given in 2007 was not supported by some evidence, was contrary to the controlling regulations, was contrary to binding legal precedents, which demonstrates an arbitrary and capricious decision. Furthermore, the Governor abjectly failed to give the Petitioner an individualized consideration of all relevant and reliable factors that tend to indicate the Petitioner is suitable for parole, which further demonstrates the mark of an arbitrary action. The decision by the Governor was a decision in search of a justification, or was an ad hoc decision made to support the predetermined decision to REVERSE Petitioner's parole grant, regardless of the Petitioner's parole suitability.

## III.

## THE GOVERNOR FAILED TO GIVE THE PETITIONER THE INDIVIDUALIZED CONSIDERATION TO WHICH HE IS ENTITLED BY FAILING TO CONSIDER ALL FACTORS TENDING TO DEMONSTRATE PETITIONER'S PAROLE SUITABILITY

CCR Title 15 §2402(d) lists nine factors that BPT Hearing Panels, and therefore the Governor, are required to consider as tending to demonstrate *a* prisoner's parole suitability. These nine factors include: (1) No Juvenile Record; (2) Stable Social History; (3) Signs of Remorse; (4) Motivation for Crime; (5) Battered Woman Syndrome; (6) Lack of Criminal History; (7) Age; (8) Understanding and Plans for Future; and (9) Institutional Behavior. Of the nine enumerated factors, subsections (1), (2), (3), (7), (8), and (9) clearly apply to the Petitioner, in that: (1) Petitioner has only one (1) juvenile misdemeanor conviction; (2) Petitioner has a stable social history; (3) Petitioner has clearly shown remorse for his actions; 7) Petitioner's present age significantly reduces the probability of recidivism; (8) Petitioner has both developed marketable skills that can be put to use upon release, and he has realistic parole plans; and (9) Petitioner's institutional activities indicate an enhanced ability to function within the law upon release.

The Governor's failure to undertake an individualized consideration of all relevant/reliable factors violates the California Supreme Court mandate in <u>Rosenkrantz</u>, supra, and also offends the Board's controlling Administrative regulations, which mandate that "[a]ll relevant, reliable information available to the panel **shall also be considered** in determining suitability for parole." (Id.; see also, CCR Title 15 §2402(b).) (emphasis added)

In Ramirez, supra, the California Court of Appeal noted "that while the Board 'commended' Ramirez for 'doing very well' in custody, its decision failed to reflect consideration of Ramirez's institutional behavior as a circumstance tending to show his suitability for parole.  This is a factor the Board is required to consider under the regulations. [Citations] Ramirez's outstanding performance while in custody was amply supported by the record.  While the Board need not recite every factor it considers in a parole hearing, particularly those it finds unpersuasive, its failure to acknowledge that Ramirez's conduct in prison was a circumstance that supported his application is yet another indication of an arbitrary and capricious determination."  (Id. @ pp. 571-72.)  The Governor's treatment of Petitioner is, if anything, even more unfair than that criticized in Ramirez , because more evidence of circumstances tending to show Petitioner was suitable for release on parole were ignored here than in the Ramirez case. (See In re Scott, supra.)

The abject failure or refusal of the California Governor to consider all relevant and reliable information available to him, which tended to demonstrate Petitioner was, in fact, suitable for release on parole, violated Petitioner's due process rights, and irreparably injured the Petitioner's liberty interest in parole.

Respectfully submitted this ___29___ day of ___March_____, 2009.

_Richard Soto_____

Richard Soto, In pro per

# ATTACHMENT "A"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | | | |
|---|---|---|---|---|
| Date: | FEBRUARY 18, 2009 | | | Deputy Clerk |
| Honorable: | PETER ESPINOZA | Judge | JULIE A. RAMIREZ | Reporter |
| | NONE | Bailiff | NONE | |

(Parties and Counsel checked if present)

BH005389
In re,
RICHARD SOTO,
    Petitioner,
On Habeas Corpus

Counsel for Respondent:

---

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

    The Court has read and considered petitioner's Writ of Habeas Corpus filed on July 2, 2008, as well as the Return and Traverse filed in response to this court's Order to Show Cause. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667).)

    Petitioner was received in the Department of Corrections on October 12, 1979 after a conviction for second-degree murder. He was sentenced to fifteen years to life in prison. His minimum parole eligibility date was May 29, 1989. The record reflects that on March 31, 1979 petitioner and his crime partners, all ambers of the Paragon gang, met the victim at a nightclub. The victim was from a rival gang neighborhood, although he was not a member. After they left the club, petitioner and his friends attacked the victim. Petitioner stabbed the victim in the side of the face with a broken beer bottle. He also retrieved a bumper jack from his car with which petitioner and his friends beat the victim. Petitioner slashed the victim's throat, killing him.

    The Board found petitioner suitable for parole after a parole consideration hearing held on October 25, 2007. The Governor exercised his authority under Penal Code §3041.2 to reverse the Board's decision. The Governor concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. He based this reversal on several factors, including the commitment offense.

    The nature of the commitment offense may indicate that a prisoner poses an unreasonable risk of danger to society when the offense is especially heinous, atrocious or cruel. (Cal. Code Regs., tit. 15, §2402, subd. (c)(1); *Rosenkrantz* at 682-683.) In some cases, "the nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole." (*Id* at 682; *In re Lawrence* (2008) 44 Cal.4th 1181, 1207.) In this case, the commitment offense was especially heinous because it was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering. (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(D).) This means that "the offense in question must have been committed in a more aggravated or violent manner than that ordinarily shown in the commission of that offense." (*In re Scott* (2004) 119 Cal.App.4th 871, 891.) An offense is more aggravated or violent when it involves severe trauma, "as where death resulted from severe trauma inflicted with deadly intensity; e.g., beating, clubbing, stabbing, strangulation, suffocation, burning, multiple wounds inflicted with a weapon not resulting in immediate death or actions calculated to induce terror in the

1

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

### DEPT 100

| | | | | |
|---|---|---|---|---|
| Date: | FEBRUARY 18, 2009 | | | Deputy Clerk |
| Honorable: | PETER ESPINOZA | Judge | JULIE A. RAMIREZ | Reporter |
| | NONE | Bailiff | NONE | |

(Parties and Counsel checked if present)

BH005389
In re,
RICHARD SOTO,
    Petitioner,
On Habeas Corpus

Counsel for Respondent:

victim." (*Id.* at 892.) In this case, the lone victim was attacked by petitioner and several of his friends. He was stabbed in the face and beaten with a bumper jack before petitioner finally killed him by slitting his throat. Clearly, the victim suffered severe trauma. Multiple wounds were inflicted and it does not appear that death was instantaneous.

There is also some evidence that the commitment offense is especially heinous because "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) "To fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily present." (*Scott*, supra, 119 Cal.App.4th at 893.) In this case, it is not entirely clear why petitioner and his fellow gang member chose this victim to attack since he was not a member of any rival gang. It appears he was killed solely because he lived in a neighborhood that was considered rival gang territory. While even a gang rivalry is a trivial motive, the motive in this case is even less significant. "A person whose motive for a criminal act cannot be explained or is unintelligible is therefore unusually unpredictable and dangerous." (*Id* at 893.) In this way, the trivial motive is some evidence that petitioner poses an unreasonable risk of danger to society.

The heinousness of the crime is relevant to petitioner's suitability for parole only if it is indicative of the "ultimate conclusion that an inmate continues to pose an unreasonable risk to public safety." (*In re Shaputis* (2008) 44 Cal. 4th 1241, 1255.) In this case, there is further evidence of an increased public safety risk based on petitioner's previous history of violence. " (Cal. Code Regs., tit. 15, §2402, subd. (c)(2).) Petitioner has been involved in criminal activity since he was a juvenile. In 1976, petitioner was convicted of assault with a deadly weapon after he shot at a rival gang member, for which he received 160 day s in jail and 36 months probation. The following year he was convicted of shooting at an inhabited dwelling. This offense was also gang-related. There was a subsequent conviction for battery in 1978. According to the psychological evaluation, this history puts him at a higher risk of reoffending than other inmates. The fact that the commitment offense was the fourth very serious, violent crime committed by petitioner is some evidence to support the Governor's conclusion that he continues to pose an unreasonable risk of danger to society.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to send notice.

2

| Minutes Entered |
|---|
| 02-18-09 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | FEBRUARY 18, 2009 | | | Deputy Clerk |
|---|---|---|---|---|
| Honorable: | PETER ESPINOZA | Judge | JULIE A. RAMIREZ | Reporter |
| | NONE | Bailiff | NONE | |

(Parties and Counsel checked if present)

BH005389
In re,
RICHARD SOTO,
      Petitioner,
   On Habeas Corpus

Counsel for Respondent:

A true copy of this minute order is sent via U.S. Mail to the following parties:

Law Offices of A. William Bartz, Jr.
3510 Torrance Boulevard, Suite 215
Torrance, CA 90503-4824
Attorney for Petitioner, Richard Soto

Department of Justice – State of California
Office of the Attorney General
Kathleen R. Frey, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

3

Minutes Entered
02-18-09
County Clerk

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | CONFORMED COPY<br>OF ORIGINAL FILED<br>Los Angeles Superior Court<br><br>FEB 19 2009<br><br>John A. Clarke, Executive Officer/Clerk<br>BY_____, Deputy<br>Carmen Sortillon |
| PLAINTIFF/PETITIONER:<br><br>RICHARD SOTO | |
| CLERK'S CERTIFICATE OF MAILING<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br>BH005389 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time        ☒ Order re: Petition for Writ of Habeas Corpus
☐ Order to Show Cause        ☐ Order re: Writ Error Coram Nobis
☐ Order for Informal Response        ☐ Order re: Appointment of Counsel
☐ Order for Supplemental Pleading        ☐ Copy of Petition for Writ of Habeas Corpus /Suitability
                                                     Hearing Transcript for the Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

February 19, 2009
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _____, Clerk
       Carmen Sortillon

Law Offices of A. William Bartz, Jr.
3510 Torrance Boulevard, Suite 215
Torrance, CA 90503-4824
Attorney for Petitioner, Richard Soto

Department of Justice – State of California
Office of the Attorney General
Kathleen R. Frey, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

# EXHIBIT #1

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

DEPT. SC 4

| Date: | OCTOBER 3, 1979 | | | |
|---|---|---|---|---|
| HONORABLE: | GEORGE PERKOVICH JR | JUDGE | O LISTER | , Deputy Clk. |
| | M SAMBOLICH | Deputy Sheriff | O OLSON | , Reporter |

(Parties and counsel checked if present)

| A616196 | | Counsel for Plaintiff | , DISTRICT ATTY. BY JOHN VAN DE KAMP DEPUTY |
|---|---|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA | | | L FELKER |
| VS | | Counsel for Defendant | W LITTLEFIELD , PUBLIC DEFENDER BY |
| 01 SOTO RICHARD ISAAC X-693745 | | | T BRESLIN DEPUTY |

**NATURE OF PROCEEDINGS PROBATION AND SENTENCE**

(Boxes checked if order applicable)

**PROBATION DENIED. SENTENCE AS INDICATED BELOW.**

Whereas the said defendant having.................................duly.................**PLEADED**
guilty in this court of the crime of **MURDER, SECOND DEGREE, IN VIOLATION OF SECTION 187 PENAL CODE OF CALIFORNIA, A FELONY AS CHARGED IN THE INFORMATION.**

It is Therefore Ordered, Adjudged and Decreed that the said defendant be punished by imprisonment in the
☐ County Jail of the County of Los Angeles for the term of.....................................

☒ **STATE PRISON**
☒ ~~County Institution~~.............................for the term ~~of~~ **PRESCRIBED BY LAW.**

☒ Defendant is given credit for........**127**.................days in custody.
It is further Ordered that the defendant be remanded into the custody of the Sheriff of the County of Los Angeles
☒ to be by him delivered into the custody of the Director of Corrections at the California State Institution
for...............**MEN**...............at...................**CHINO**...................

**ENTERED**
OCTOBER 3, 1979
JOHN J CORCORAN
COUNTY CLERK
AND CLERK OF THE
SUPERIOR COURT

☐ Remaining count(s) dismissed in interests of justice.
☐ Bail exonerated.
gdk

2   75J 605A - (REV. 10-78) 10-78
C1/98

**JUDGMENT**

PINK ORIGINAL TO FILE
WHITE COPY TO MICROFILM
YELLOW COPY TO STATE FILE

SCREEN COPY TO PROBATION EXPEDITER
GOLDENROD TO COUNTY JAIL

FORM CR

SUPERIOR COURT OF CALIFORNIA, COUNTY OF __LOS ANGELES__

BRANCH __SOUTH CENTRAL DISTRICT__

FOR COURT USE ONLY

COURT I.D.
| 1 | 9 | 0 | 0 | 1 | 3 |

(S.P. USE ONLY)

PEOPLE OF THE STATE OF CALIFORNIA        versus

DEFENDANT:  01 SOTO RICHARD ISAAC        ☒ Present   ☐ Not Present
AKA:

REPORT TO JUDICIAL COUNCIL OF: ☒ INDETERMINATE SENTENCE TO STATE PRISON
☐ SENTENCE CHOICE OTHER THAN STATE PRISON   CASE NUMBER: __A616196__

Hearing __10-3-79__  Dept. No. __SC M__  Judge __GEORGE PERKOVICH JR__  Clerk __C LISTER__
Reporter __C OLSON__                      Counsel for People __L FELKER__
Counsel for Defendant __T BRESLIN DPD__   Probation Number or Probation Officer __X-693245__

1. Defendant was convicted of the commission of the following crimes:
   ☐ Additional counts are listed on attachment 1.a.

| Count | Code Section | Crime and Degree | Date of Conviction Mo. Day Yr. | Conviction by: Jury Trial | Court Trial | Plea | Enhancements Charged and Found PC 12022 | PC 12022.5 | PC 12022.6 | PC 12022.7 | Additional term stric due to circumstance in mitigation PC 1170.85 | PC 1170.86 | PC 1170.87 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | PC 187** | MURDER SECOND DEGREE | 9-5-79 | | | X | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

2. The defendant was charged and found to have served prior prison terms: __0__ terms for violent felonies; __0__ terms for other felonies.

3. ☒ Defendant was sentenced to State Prison for the term prescribed by law on counts __1, __, __, __.

4. ☐ Counts __, __, __, __ were deemed misdemeanors.
   A. ☐ Defendant sentenced to _____ days in county jail for all counts.
      Number
      (1) Execution of _____ days suspended.
          Number
   B. ☐ Defendant fined in sum of $ _____.

5. ☐ For counts __, __, __, __ the defendant was placed on probation.
   A. (1) ☐ Sentence pronounced and execution of sentence was suspended; or
      (2) ☐ Imposition of sentence was suspended.
   B. Conditions of probation included ☐ Jail Time _____ days    ☐ Fine

6. Other dispositions
   A. ☐ Defendant was committed to California Youth Authority.
   B. ☐ Proceedings suspended, and defendant was committed to California Rehabilitation Center.
   C. ☐ Proceedings suspended, and defendant was committed as a Mentally Disordered Sex Offender.
   D. ☐ Proceedings suspended, and defendant was committed as mentally incompetent.
   E. ☐ Other (Specify) _____

NOTE: PURSUANT TO ARTICLE VI, SECTION 6 OF THE CALIFORNIA CONSTITUTION AND SECTION 68505 OF THE GOVERNMENT
CODE, THE CHIEF JUSTICE REQUIRES THAT EACH SUPERIOR COURT SHALL COMPLETE THIS FORM FOR EACH INDETER-
MINATE SENTENCE TO STATE PRISON OR SENTENCE CHOICE OTHER THAN STATE PRISON. THE REPORTS IMPLEMENT
SECTION 1170.4 OF THE PENAL CODE AND SHALL BE MAILED TO: ADMINISTRATIVE OFFICE OF THE COURTS,
4200 STATE BUILDING, SAN FRANCISCO, CALIFORNIA 94102

DATE __SC OCT 4 1979__   SIGNATURE OF CLERK _____

Form Adopted by the
Judicial Council of California
Effective July 1, 1977

REPORT—INDETERMINATE SENTENCE,
OTHER SENTENCE CHOICE
FORM CR 291 (7/1/77)

Const., Art. VI, 1
Pen C. 1170.4, 1170

White copy to Administrative Office of the Courts

# EXHIBIT #2

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )        CDC Number:  C-09455
Term Parole Consideration )
Hearing of:              )
                         )
RICHARD SOTO             )        Inmate Copy
_____)

AVENAL STATE PRISON

AVENAL, CALIFORNIA

OCTOBER 25, 2007

11:30 A.M.

INMATE COPY

PENDING REVIEW
AND APPROVAL

PANEL PRESENT:

MICHAEL PRIZMICH, Presiding Commissioner
ALEJANDRO ARMENTA, Deputy Commissioner

OTHERS PRESENT:

RICHARD SOTO, Inmate
LEON R. HARRIS, Attorney for Inmate
ROBERT BUDMAN, Deputy District Attorney


CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____No       See Review of Hearing
_____Yes      Transcript Memorandum




Gina Lavoie, Capitol Electronic Reporting

# I N D E X

|  | Page |
|---|---|
| Proceedings........................................... | 3 |
| Case Factors......................................... | 21 |
| Pre-Commitment Factors............................... | 25 |
| Post-Commitment Factors.............................. | 42 |
| Parole Plans......................................... | 67 |
| Closing Statements................................... | 78 |
| Recess............................................... | 88 |
| Decision............................................. | 89 |
| Adjournment.......................................... | 99 |
| Transcript Certification............................. | 100 |

# P R O C E E D I N G S

**PRESIDING COMMISSIONER PRIZMICH:**   Okay, we are on the record in the matter of the 14th Subsequent Parole Consideration Hearing for Richard Soto, CDC number C as in Charles 09455.   The date is 10/25/07, and the time is 11:30.   We're located at Avenal State Prison.   The inmate was received on 10/12/79, committed from Los Angeles County.   The life term began on 10/12/79.   The inmate's minimum eligible parole date was 5/29/89. Controlling offense for which the inmate is committed is set forth in case number 616196.   Charge in count one, a violation of Penal Code Section 187.   That is murder in the second degree.   The inmate received a term of 15 years to life.   The victim of this murder was Javier Gonzalez.

    Mr. Soto, this hearing is being tape recorded, and for purpose of voice identification so the transcriber can later transcribe who is saying what, we're going to go around the room and introduce ourselves.   I'll start with myself.   I'll say my first name, say my last name, and I'll spell my last name. We'll go to my right, sir, to your left, and we'll go to Mr. Armenta.   He will introduce himself.   We'll then go to your Attorney, who will then introduce himself, sir. Then we'll go to you.   If you would introduce yourself

1  by saying your first name, saying your last name, and

2  giving us your CDC number we'd appreciate it.   Once

3  you're done, sir, we have the District Attorney from Los

4  Angeles County who will be participating via a

5  television hookup.   He will then introduce himself.   So

6  with that, I do want to, for the record, note that there

7  are two correctional officers in the room.   They're here

8  for security purposes only.   They won't be participating

9  other than providing security.   So with that, sir, I

10  will get started.   My name is Mike Prizmich, P-R-I-Z-M-

11  I-C-H, I'm the Presiding Commissioner.

12      **DEPUTY COMMISSIONER ARMENTA:**   My name is

13  Alejandro Armenta, A-R-M-E-N-T-A, I'm a Deputy

14  Commissioner.

15      **MR. HARRIS:**   Leon R. Harris the third, H-A-R-R-I-

16  S, I'm the Attorney representing Mr. Soto this morning.

17      **INMATE SOTO:**   I'm inmate Richard Soto, last name

18  is capital S O-T-O, CDC number C-09455.

19      **PRESIDING COMMISSIONER PRIZMICH:**   Thank you, sir.

20      **DEPUTY DISTRICT ATTORNEY BUDMAN:**   Robert Budman,

21  B-U-D-M-A-N, Deputy District Attorney, Los Angeles

22  County.

23      **PRESIDING COMMISSIONER PRIZMICH:**   Thank you, Mr.

24  Budman.   Sir, we're going to go through a short process

25  of trying to determine if you have any Americans with

1  Disability Act issues that we need to deal with or

2  attend to. One of the ways of doing that is to have you

3  read out loud that statement that's in front of you.

4  Could you do that for us, please.

5      **INMATE SOTO:** Yes, Sir. ADA, Americans with

6  Disabilities Act.

7          "The Americans with Disabilities Act, ADA,

8          is a law to help people with disabilities.

9          Disabilities are problems that make it harder for

10         some people to see, hear, breathe, talk, walk,

11         learn, think, work or take care of themselves

12         than it is for others. Nobody can be kept out of

13         public places or activities because of a

14         disability. If you have a disability, you have

15         the right to ask for help to get ready for your

16         BPH, Board of Parole, hearing, get to the

17         hearing, talk, read forms and papers, and

18         understand the hearing process.

19         "BPH will look at what you ask for to make

20         sure that you have a disability that is covered

21         by the ADA and that you have asked for the right

22         kind of help. If you do not get help or if you

23         don't think you got the kind of help you need,

24         ask the BPT 1074 grievance form. You can also

25         get help to fill it out."

1      **PRESIDING COMMISSIONER PRIZMICH:**  Thank you, sir.

2  Did you understand what you read there, sir?

3      **INMATE SOTO:**  Yes, Sir.

4      **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Another

5  way of determining if there's a disability that you have

6  that we need to attend to is to look on the form 1073,

7  and that's the form that you would use to request a

8  special accommodation should you have a disability.  And

9  I notice that you signed the form on August 6th, 2007,

10  and there was no disability listed on that form that you

11  might need assistance with.  That was true a couple of

12  months ago, sir, is it still true today?

13      **INMATE SOTO:**  Yes, Sir.

14      **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  I also

15  have a series of questions to ask of you.  The questions

16  may sound odd, but basically what they're designed to do

17  is to determine on our part if there's a disability that

18  you may not be aware of that we need to be aware of in

19  terms of taking care of you and your ability to attend

20  the hearing.  So if you'd listen to each question that I

21  ask and then respond to each one, I would appreciate it.

22  Do you have any difficulty walking a distance of a

23  hundred yards, sir?

24      **INMATE SOTO:**  No, Sir.

25      **PRESIDING COMMISSIONER PRIZMICH:**  Do you have any

1   difficulty walking up or down stairs, sir?

2         INMATE SOTO:  No, Sir.

3         PRESIDING COMMISSIONER PRIZMICH:  I notice that

4   you have glasses on, sir.  Are they for reading and

5   distance or just reading or just distance?

6         INMATE SOTO:  Both.

7         PRESIDING COMMISSIONER PRIZMICH:  They're for

8   both?

9         INMATE SOTO:  Yes.

10        PRESIDING COMMISSIONER PRIZMICH:  And is the

11   magnification adequate for you to read printing that

12   maybe your Attorney might have to share with you?

13        INMATE SOTO:  Correct.

14        PRESIDING COMMISSIONER PRIZMICH:  Okay.  Have you

15   had any difficulty hearing, sir?

16        INMATE SOTO:  No, Sir.

17        PRESIDING COMMISSIONER PRIZMICH:  Okay, when we

18   went around the room and introduced ourselves, were you

19   able to hear all four corners of the room adequately,

20   sir?

21        INMATE SOTO:  Yes, Sir.

22        PRESIDING COMMISSIONER PRIZMICH:  And what about

23   Mr. Budman, who is participating via television, were

24   you able to hear him okay once I turned him up a bit?

25        INMATE SOTO:  Yes, Sir.

1     **PRESIDING COMMISSIONER PRIZMICH:** Okay.  If that

2     is a little bit low when he begins to speak, would you

3     let me know, but I'm usually pretty attentive to that,

4     and I'll raise it for you, okay?

5          **INMATE SOTO:** Yes, Sir.

6          **PRESIDING COMMISSIONER PRIZMICH:** Do you have,

7     have you ever been included in CCCMS or EOP mental

8     health programs?

9          **INMATE SOTO:** No, Sir.

10         **PRESIDING COMMISSIONER PRIZMICH:** Have you taken

11    any psychotropic medication, either in prison or on the

12    street?

13         **INMATE SOTO:** No, Sir.

14         **PRESIDING COMMISSIONER PRIZMICH:** How far did you

15    get in school, sir?

16         **INMATE SOTO:** I finished high school, well,

17    before my incarceration I got up to 11th grade.

18         **PRESIDING COMMISSIONER PRIZMICH:** Okay.  That's

19    mainly what I was interested in.

20         **INMATE SOTO:** Yes.

21         **PRESIDING COMMISSIONER PRIZMICH:** So prior to

22    getting into incarceration, you were through 11th grade.

23    Did you take any special -- or get to 11th grade.  Did

24    you take any special education classes while you were in

25    school, sir?

1    **INMATE SOTO:**  No, Sir.

2    **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Do you

3   suffer from disability that you're aware of that would

4   inhibit or prevent your ability to participate in this

5   hearing here today, sir?

6    **INMATE SOTO:**  No, Sir.

7    **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Mr.

8   Harris, I'm going to ask you if your client's Americans

9   with Disability Act has been addressed to the best of

10   your knowledge.

11    **MR. HARRIS:**  Yes, they have, thank you.

12    **PRESIDING COMMISSIONER PRIZMICH:**  Thank you.  Mr.

13   Soto, I'm going to describe to you the hearing process.

14   I know you've been through these before, but we're going

15   to kind lay out what we'll be doing here today.  And I

16   do want to note just for your own comfort level that

17   some inmate's tend to want to lean into the mic.  You

18   don't need to do that.  It only picks up your voice.  It

19   doesn't amplify it.  So if we need to have you speak

20   louder, we'll have to tell you that.  This isn't going

21   to do it for us.  But it may be, it's somewhat less

22   comfortable to have to be leaning into the mic all the

23   time, so you don't need to do that.  With that, I'll get

24   started with the description.

25    The hearing, this hearing is being conducted

1   pursuant to Penal Code Sections 3041 and 3042 and the

2   Rules and Regulations of the Board of Parole Hearings

3   governing Parole Consideration Hearings for Life

4   Inmates.  The purpose of today's hearing is to consider

5   your suitability for parole.  To accomplish this, we

6   will consider the nature and nature of crimes you were

7   committed for, your prior criminal and social history,

8   your behavior and programming since your commitment.

9       We have had an opportunity to review your Central

10  file, and you will be given an opportunity to correct

11  and clarify that record.  We'll consider your progress

12  since your commitment, your counselor's report, and your

13  psychological report.  You may have already submitted

14  parole plans, and sometimes parole plans change at the

15  last minute.  It's very common.  So if you have some

16  changes in your parole plans, we need to hear about the

17  most update parole plans here today.

18      Sir, we'll reach a decision here today and we'll

19  inform you whether or not we find you suitable for

20  parole, and we'll provide you with the reasons for our

21  decision.  If you are found suitable for parole, the

22  length of your confinement will be explained to you.

23  Before we go any further, I want to advise you we expect

24  you to be totally honest with us today.  Not only is

25  honesty a good practice to follow in every day life, in

1   today's case, if you don't get a parole date, future

2   Panels may reflect back on what you've said here today.

3   This is being transcribed and then they'll have the

4   ability to reflect back on what you've said here today.

5   And if you lie to us today that could affect you in the

6   future, and I'm sure you don't want that burden to have

7   to overcome along with the other things.

8         Nothing, sir, that happens here today will change

9   the finding of the court. We're not here to retry your

10   case. We may ask you some questions about .the case, and

11   it is your right to either talk about the case or not.

12   That's up to you. But the reason we ask you questions

13   about the case is not to determine if the court did the

14   right thing or not. The reason we talk to you about the

15   case is to determine in our minds your suitability for

16   parole. And that's one of the ways we do that, is to

17   talk about the case. We may ask questions about, for

18   example, what your frame of mind was then, if your frame

19   of mind has changed between then and now. Those are all

20   indicators to us as to what level of suitability you

21   might have for parole. But we're not going to retry the

22   case. We're going to take the case as it stands.

23         The hearing will be conducted in two phases. I

24   will discuss with you the crime that you were committed

25   for, your prior criminal and your social history, any

1   parole plans that you may have, and any letters of

2   support or opposition that may be in your file.

3   Commissioner Armenta will discuss with you your progress

4   since your commitment, your counselor's report and your

5   psychological evaluation.  Once this is concluded, that

6   is, once the Commissioner and myself have asked you all

7   the questions we need to and discussed all the factors

8   that we need for us to make a determination on

9   suitability, we will then go to the District Attorney

10  from Los Angeles County and he'll be given an

11  opportunity to ask you questions.  Once he's done, we'll

12  then go to your Attorney and he'll be given an

13  opportunity to ask you some questions.

14        Once that portion of the hearing is done, we'll

15  go back to the District Attorney from Los Angeles, and

16  he will make a closing statement, your Attorney will

17  make a closing statement, sir, then we'll turn our

18  attention to you and you'll be given an opportunity,

19  excuse me, to make a closing statement.  Your closing

20  statement should be directed at why you feel you're

21  suitable for parole.  Once all that has occurred, we

22  will recess for deliberations and determine your

23  suitability.

24        The California Code of Regulations states that

25  regardless of the time served a life inmate shall be

1   found unsuitable for and denied parole if in the

2   judgment of the Parole Panel the inmate would pose an

3   unreasonable risk of danger to society if released from

4   prison.  Mr. Soto, you have certain rights.  These

5   rights include the right to a timely notice of this

6   hearing, the right to present relevant documents, and

7   the right to review your central file.  And, sir, I'll

8   ask you, were you given an opportunity to go through and

9   review your central file?

10          **INMATE SOTO:**  Yes, Sir.

11          **PRESIDING COMMISSIONER PRIZMICH:**  Did you take

12  that opportunity?

13          **INMATE SOTO:**  Yes, Sir.

14          **PRESIDING COMMISSIONER PRIZMICH:**  And was the

15  timeframe adequate for you to get through it?

16          **INMATE SOTO:**  Yes, Sir.

17          **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  And I

18  know your Attorney has submitted on behalf of you some

19  documents, so I'm going to ask your Attorney, has your

20  client's rights in these three regards been met as far

21  as you can tell, sir?

22          **MR. HARRIS:**  Yes, they have, thank you.

23          **PRESIDING COMMISSIONER PRIZMICH:**  Okay, thank

24  you.  Mr. Soto, you also have the right to be heard by

25  an impartial Panel.  Today the Panel consists of myself,

1   Mike Prizmich, and Mr. Armenta.  We're the two that will

2   be deciding on your parole suitability.  Do you have an

3   objection to the Panel, sir?

4           INMATE SOTO:  No.

5           PRESIDING COMMISSIONER PRIZMICH:  Mr. Harris?

6           MR. HARRIS:  No, Sir.

7           PRESIDING COMMISSIONER PRIZMICH:  You'll receive

8   a copy of our written tentative decision today.  Our

9   decision is subject to review by the decision review

10  unit, it's subject to review by the Board of Parole

11  Hearings at a meeting held as a body.  It will become

12  effective in approximately 120 days and is also subject

13  to review by the Governor.  A copy of our tentative

14  decision that we make here today and a copy of the

15  transcript at a later time will be sent to you, sir.  As

16  of May, 2004, there were some major changes in the

17  hearing procedures.  Prior to May, 2004, a Panel would

18  render a decision, like we will today, and if you

19  disagreed with that Panel's decision you could appeal

20  their decision to the Board of Parole Hearings.

21          What changed after 2004 was, you still get to

22  make an appeal of the decision of the Panel, but it no

23  longer goes to the Board of Parole Hearings.  It goes to

24  court versus the Board of Parole Hearings.  So that was

25  the major change in the hearing procedures.  I would

1   suggest at the conclusion of today's hearing, if that's

2   something you consider certainly talk it over with your

3   Attorney.  Or if you want to look it up yourself on how

4   to do this, you can go to the prison law library and

5   look under Administrative Appeals, Correspondence, and

6   Grievance Concerning the Board of Parole Hearings, and

7   they'll outline how you make the appeal there.

8           Sir, you're not required to admit or discuss your

9   offense today if you don't wish to.  However, the Panel

10  does accept as true the findings of the court, as I've

11  already said, and you are invited to discuss those facts

12  and circumstances of the offense if you so desire.  The

13  Board will consider any prior statements that you made

14  relative to the offense and any statements that you make

15  today in determining your suitability for parole.  I'm

16  going to turn my attention just briefly to Mr. Armenta

17  and ask if there's any confidential material that exists

18  in Mr. Soto's file, and if so will be utilizing any of

19  that?

20          **DEPUTY COMMISSIONER ARMENTA:**  Mr. Soto has two

21  files, and we only have one of them here, so we just

22  asked for the other one, where that information would

23  be.

24          **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Then

25  I'll come back to you.

1      **DEPUTY COMMISSIONER ARMENTA:**  Yes.

2      **MR. HARRIS:**  Just to affirm, there were two files

3   when I did the C file review, two volumes.

4      **DEPUTY COMMISSIONER ARMENTA:**  Well, file one says

5   there's two files.  That's why I know there's two files.

6      **PRESIDING COMMISSIONER PRIZMICH:**  Okay, so we'll

7   come back and respond to that question once the lifer

8   desk comes over with the other file, I guess?

9      **DEPUTY COMMISSIONER ARMENTA:**  Yeah.

10     **PRESIDING COMMISSIONER PRIZMICH:**  If I could have

11  both Attorneys turn to the form 1008.  Mr. Soto, the

12  form 1008 is a form that's located at the top of,

13  usually the top of the packets and it's a checkbox form

14  that contains all the possible documents we could have

15  in your case.  Some of the boxes are checked as

16  indicating that we have those documents for review, and

17  some of them aren't.  What I'm going to ask the

18  Attorney's to do is follow down the list with me and

19  determine if your Attorney and the District Attorney

20  have the same set of documents that we have.  And if

21  there's a difference we'll evaluate that at that point,

22  whether it needs to be, something needs to be done with

23  regard to that.  So if the Attorneys, Mr. Budman and Mr.

24  Harris, can follow along, I'll read off the checked

25  boxes.  Number one is checked, number two is checked,

1   number three is not checked but that, let me ask Mr.

2   Budman, do you have the most current psychological

3   evaluation of '07?

4        **DEPUTY DISTRICT ATTORNEY BUDMAN:**  I do,

5   Commissioner, thanks.

6        **PRESIDING COMMISSIONER PRIZMICH:**  Okay, good.

7   Okay, I always do that with my breath held.  But the

8   number three, psychiatric report, as I understand, Mr.

9   Harris, you have your copy of the psych report?

10        **MR. HARRIS:**  Yes, I do.

11        **PRESIDING COMMISSIONER PRIZMICH:**  And your client

12   has his?

13        **MR. HARRIS:**  Yes, Sir.

14        **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  That is

15   not checked, and I'm going to just mark for purposes of

16   the record that we all received the psych report.  And

17   if they weren't timely, Mr. Harris, I'll ask if you can

18   note that in the objection portions of this.  But we all

19   currently have them.  Let me get this down.  Number four

20   is checked.  Number five the major heading, notices and

21   responses, is checked, and underneath number five,

22   subheadings, notices and responses, official's letters

23   and supporting letters are all checked.

24        Number six, the major heading of legal documents

25   is checked.  Underneath legal documents, probation

1  officer's report, arrest report, abstract of judgment,

2  charging document, and sentencing transcript are all

3  checked.  Number seven, miscellaneous is checked.

4  Underneath the major heading of miscellaneous, crime

5  partners is checked, notice of hearing, disciplinary

6  reports, confidential folder and other are all checked.

7  Can I ask Mr. Harris, does that accurately reflect what

8  you have with the addition of the psych report that I've

9  penciled in?

10       **MR. HARRIS:**  Yes, it does.  The only thing I'll

11  note is that at the bottom of the form it's not signed

12  or dated by anybody, either.

13       **PRESIDING COMMISSIONER PRIZMICH:**  Yes, you're

14  right.  That's typically signed and dated and that is

15  not done in this case.  Mr. Budman?

16       **DEPUTY DISTRICT ATTORNEY BUDMAN:**  I don't have

17  the confidential fold.  I don't have, although I believe

18  there was just one copy of the disciplinary reports.

19  Other than that, I believe I have everything that's

20  pertinent to the hearing.

21       **PRESIDING COMMISSIONER PRIZMICH:**  Okay, thank

22  you.  I just made a note of that, and I'm going to enter

23  that into Exhibit, into the record as Exhibit One.  Are

24  there any additional documents?  Okay, let me hold off,

25  are there any additional documents to be provided here

1  today, Mr. Harris?

2      MR. HARRIS:  Not aside from the ones I've

3  previously given you, no, Sir.

4      PRESIDING COMMISSIONER PRIZMICH:  You did give us

5  some documents in a folder that we'll get to in just a

6  moment.  Mr. Armenta just received the file number two

7  of Mr. Soto's.  He's going to go through that right now,

8  but I'll ask in the meantime, are there any preliminary

9  objections?  If I'm not mistaken, the psych report was

10  provided late.  Is that accurate?

11      MR. HARRIS:  I got it on October 11th, 2007,

12  which is the day I was here at this institution doing, I

13  think the interviews for this or the very next day.  I

14  can assure that Mr. Soto has received a copy of it, and

15  I can't tell you when, I mean, the 11th is still within

16  the 10-day rule, but it's, like, he's got it, I've got

17  it, we all took a look at it, we had a chance to review

18  it and talk about it, so we're prepared to move forward.

19      PRESIDING COMMISSIONER PRIZMICH:  Okay, well, you

20  know, Mr. Soto, we're sorry for that, because there is a

21  requirement that you receive that in a, in a certain

22  timeframe ahead of the hearing and then that apparently

23  didn't happen for either you or your Attorney.  We

24  appreciate your interest to move forward, and we'll go

25  ahead and do that if that is still okay.  But again,

1  we're sorry for not attending to the, to the appropriate

2  timeframe on that.  Mr. Armenta, have you had an

3  opportunity to go through the confidential portion of

4  Mr. Soto's folder, and will we be utilizing any

5  information of it?

6      **DEPUTY COMMISSIONER ARMENTA:**  No, we're not.

7  There's information there, but nothing that should be

8  used at all.

9      **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Okay,

10  with that, Mr. Harris, will the inmate be speaking to

11  the Panel today?

12      **MR. HARRIS:**  Yes, he will, but he has chosen not

13  to speak about the commitment offense itself only.

14      **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  Sir,

15  since you will speaking to the Panel on all matters, I

16  assume all matters but not related to the commitment

17  offense itself, is that accurate?

18      **INMATE SOTO:**  Yes, Sir.

19      **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  We will

20  need to swear you in, so if you'd raise your right hand.

21  Sir, do you solemnly swear or affirm that the testimony

22  that you give at today's hearing will be the truth, the

23  whole truth and nothing but the truth, sir?

24      **INMATE SOTO:**  Yes, Sir.

25      **PRESIDING COMMISSIONER PRIZMICH:**  Thank you.

1   I'll start the hearing by reading into the record the

2   Statement of Facts.  And I'm reading from the deputy

3   probation officer's report dated, not dated, page six

4   and seven it looks like.  It's under tab number six.

5   And starting on page six, on line, it looks like 11.

6   I'll give you a moment to get there.

7            "The victim had grown up in the Maravilla

8        Gang area.  However, he was not a member of the

9        Maravilla gang.  The victim apparently had gone

10       to a nightclub in Huntington Park area called the

11       7118 Club.  It appears that the victim went to

12       this club to find some musicians to form a new

13       group.  It appears the victim was drinking beer

14       and smoking marijuana on the evening of the

15       offense.  The victim appears to have met his

16       assailants in this club on the night of

17       3/31/1979, leaving with his assailants in Soto's

18       car.

19            "It appears that there were some other

20       individuals involved who were not arrested who

21       beckoned," that doesn't sound like it fits in

22       there, "were not arrested to beckoned out of the

23       situation because they felt that the victim was

24       going to get assaulted and they did not want to

25       have any part of it.  The victim left with Soto,

1    Henry Garcia," and I'll spell Garcia, G-A-R-C-I-

2    A, "Edwin Lopez, L-O-P-E-Z, and Frank Villa, V-I-

3    L-L-A, and Fidel Barrios, B-A-R-R-I-O-S.   It

4    appears that the defendant and Henry Garcia

5    intended to assault the victim all along, looking

6    for members of their gang to find out if anyone

7    had anything against the Maravilla Gang.

8         "The victim and his assailants were

9    drinking at 10414 State Street, and apparently

10   left that location for 2719 East 112th Street in

11   Linwood, where the victim was found dead.   It

12   appears that at the time of his death the victim

13   was legally drunk and that Soto in this case

14   stabbed the victim on the side of his face with a

15   broken beer bottle and subsequently slashed the

16   victim's throat, causing the death wound.

17   Additionally, it is alleged that Henry Garcia hit

18   the victim in the chest area with a bumper jack,

19   breaking a bone.   There were also contusions

20   about the body of the victim on both sides of his

21   face, around the victim's mouth.   Additionally,

22   the victim appears to have been kicked and

23   mauled."

24   Defendant's statement in this matter, continuing

25   on page seven,

1    "Defendant was interviewed at the new

2  county jail and initially he declined oral

3  statement or written statement regarding his

4  participation in this offense. After going

5  through most of the investigation, the defendant

6  began to loosen up and did speak with the

7  probation officer regarding the present offense.

8  The defendant does admit to the assault of the

9  victim but states that he does not remember

10  slashing the victim's throat. He states that he

11  remembers stabbing the victim in the face with a

12  beer bottle."

13  Continuing just a bit more,

14    "The defendant states he is glad he was

15  caught because he felt guilty about what he had

16  done and now that he is facing sentence he will

17  feel better inasmuch as he will be paying for

18  what he did. The defendant states he had nothing

19  against the victim, saying he probably was a nice

20  guy. Regarding the crime being a gang violence,

21  the defendant states that this assault had

22  nothing to do with being in a gang or any kind of

23  gang retaliation. Defendant states that whatever

24  happens in Linwood cops blame on gangs.

25  Defendant would not state who hit the victim with

1      the bumper jack, but stated he did not hit the

2      victim with the bumper jack.  Regarding a motive

3      for the present offense, the defendant states he

4      does not know why he did it and does not

5      understand how it came about.  Defendant states

6      he is willing to accept his punishment and that

7      he wants to do what, do what, do that to relieve

8      his own guilt."

9          Without talking about the offense itself, Mr.

10     Soto, the victim in this case, Mr. Gonzalez, was that

11     the first time you met him was at that bar or that club

12     or whatever it was?

13          INMATE SOTO:  That was the first time that

14     evening, sir.

15          PRESIDING COMMISSIONER PRIZMICH:  Okay.  Mr.

16     Armenta, do you have any questions at all?

17          DEPUTY COMMISSIONER ARMENTA:  You've been down

18     for 20 sum years?

19          INMATE SOTO:  Yes, Sir.

20          DEPUTY COMMISSIONER ARMENTA:  Twenty-eight?

21          INMATE SOTO:  Approximately 28 years, a little

22     more.

23          DEPUTY COMMISSIONER ARMENTA:  Okay.  I'm trying

24     to figure out a question not related to the, to the

25     crime.  But had you not been involved in that crime, not

1 received the sentence that you received, what would you

2 be doing right now? What do you think? What kind of

3 life do you think you would have been, you would have

4 had?

5     INMATE SOTO: The frame of mind at that moment of

6 that year of my life, I couldn't answer right now,

7 because I was a confused young individual. I was doing

8 all the steps, working, married, wanted to do right, but

9 it just seemed, nothing would go right for me.

10     DEPUTY COMMISSIONER ARMENTA: What would you like

11 to have, right now you look back and you could

12 restructure your life, what would you like to, where

13 would you like to be at this point of your life?

14     INMATE SOTO: A married man spending time with

15 his grandkids, owning my own home, still working,

16 praying for retirement.

17     DEPUTY COMMISSIONER ARMENTA: Yeah, okay. I

18 don't have any other questions.

19     PRESIDING COMMISSIONER PRIZMICH: I'm going to go

20 to your criminal history. Your juvenile record consists

21 of the following, 2/1/72, Linwood PD Business and

22 Profession Code 25662, minor in possession of alcohol.

23 You were counseled and released. Was that in school

24 that you got caught, or was that after school, do you

25 remember?

1    INMATE SOTO:  No, Sir, I believe that was on a

2  weekend, standing in a front yard of some friends.

3    PRESIDING COMMISSIONER PRIZMICH:  Okay, so you

4  were drinking, the cops saw you or something?

5    INMATE SOTO:  Well, actually, no.  There was a

6  few of us just standing in the front yard.  The police

7  pulled up and called us to the, to his car, and we went

8  up to his car, and he arrested us for possession of

9  alcohol.  There was a beer can on the curb.  And he took

10  us in under possession of alcohol and released us.

11    PRESIDING COMMISSIONER PRIZMICH:  Had you not

12  been drinking?

13    INMATE SOTO:  No, Sir.

14    PRESIDING COMMISSIONER PRIZMICH:  In terms of

15  adult convictions and arrest, on 11/13/75, Linwood

16  Police Department, Penal Code Section 217, assault with

17  intent to commit murder.  The disposition on that was a

18  Penal Code Section 245 subsection A, assault with a

19  deadly weapon.  You received 36 months formal probation

20  and 160 days in jail.  What occurred in that case, do

21  you remember, sir?

22    INMATE SOTO:  I don't know which one that one

23  could be.

24    PRESIDING COMMISSIONER PRIZMICH:  It was the

25  first one.  The first, there are several arrests here,

1   but that was the first one.   Thirty-six months, 160 days

2   in jail.  Was that gang-related to you think, do you

3   remember?

4        INMATE SOTO:   Yes, Sir.   That was, that one was

5   gang-related.

6        PRESIDING COMMISSIONER PRIZMICH:   And what was

7   the weapon, do you remember?

8        INMATE SOTO:   Shotgun.

9        PRESIDING COMMISSIONER PRIZMICH:   Okay, and did

10   you actually shoot the shotgun or did you just point it

11   at somebody?

12        INMATE SOTO:   I pointed at him and I shot him.

13        PRESIDING COMMISSIONER PRIZMICH:   Okay.

14        INMATE SOTO:   Yes, Sir.

15        PRESIDING COMMISSIONER PRIZMICH:   And he did, he

16   was injured?

17        INMATE SOTO:   Yes, Sir.

18        PRESIDING COMMISSIONER PRIZMICH:   Okay.   Was

19   that, was that a drive-by or was that --

20        INMATE SOTO:   No, he parked the car and jumped

21   out of his car.

22        PRESIDING COMMISSIONER PRIZMICH:   Okay.

23        INMATE SOTO:   And that's when I pointed my

24   shotgun at him and I shot him.

25        PRESIDING COMMISSIONER PRIZMICH:   And when you

1  say, parked his car and jumped out of his car?

2      INMATE SOTO:  Well, he jumped out of his car with

3  some other gang members.

4      PRESIDING COMMISSIONER PRIZMICH:  Opposing gang

5  members?

6      INMATE SOTO:  Yes.

7      PRESIDING COMMISSIONER PRIZMICH:  Okay, and you

8  knew that?  Did they have, they were flying colors or

9  something?

10     INMATE SOTO:  Yes, Sir, they had been coming by,

11 shooting at us for the prior two weeks.

12     PRESIDING COMMISSIONER PRIZMICH:  The same group?

13     INMATE SOTO:  Same group.

14     PRESIDING COMMISSIONER PRIZMICH:  Okay.  What was

15 his injuries, do you remember?

16     INMATE SOTO:  The front of his body was shot with

17 the shotgun pellets.

18     PRESIDING COMMISSIONER PRIZMICH:  Okay, was it a

19 12 gauge?

20     INMATE SOTO:  Twelve gauge.

21     PRESIDING COMMISSIONER PRIZMICH:  Twelve gauge?

22     INMATE SOTO:  Yes, Sir.

23     PRESIDING COMMISSIONER PRIZMICH:  Okay, and then

24 following that, 6/19/76, Linwood PD, Penal Code Section

25 246, which is shooting into an inhabited dwelling, and

1    also associated with that was a Penal Code Section 217,

2    assault with intent to commit murder, Penal Code Section

3    12022 point five, use of a firearm, and I guess all in

4    the same offense here, Penal Code Section 245 A, assault

5    with a deadly weapon.  The disposition on all of that

6    was Penal Code Section 246, shooting into an inhabited

7    dwelling, you were convicted on that and that alone.  It

8    looks like 36 months formal probation and another 160

9    days in county jail or, yeah, county jail.  Was that

10   also a gang-related situation?

11        **INMATE SOTO:**  Yes, Sir.

12        **PRESIDING COMMISSIONER PRIZMICH:**  And was it, was

13   it a drive-by, was that?

14        **INMATE SOTO:**  No, Sir, we were actually coming

15   back from a fishing trip, my brother, my cousin, and

16   myself.  And we were approached at an intersection by

17   some gang members, and through their comments that they

18   made, my brother starting chasing them, and we ended up

19   in front of their house and when they ran into their

20   house, I had run, they lived around the corner from me.

21   I ran around the corner, got my pistol, ran back around

22   the corner in my brother's truck, and went to their

23   home, and they came out with a pistol and fired upon us

24   and I returned fire on them.

25        **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  On

1  10/7/77, South Gate PD, Penal Code Section 245

2  subsection A, assault with a deadly weapon, H and S

3  Section 11377 subsection A, possession of a controlled

4  substance.  And that was, the disposition on that was

5  detention only.  You were exonerated on that.  Did they

6  just not press charges?  Did you have narcotics on you

7  at that time?  Was it, do you remember what that

8  circumstance was?  Because that didn't go forward.

9       **INMATE SOTO:**  No, Sir.  I was arrested, placed in

10 the South Gate Police substation for a crime committed

11 in that city, some people had gotten shot, and about

12 four o'clock in the morning they cam and told me that my

13 car was on fire and they released that morning on bail.

14 And the day of my court hearing I showed up at the court

15 they told me I didn't have one, that it was forgotten

16 about.

17      **PRESIDING COMMISSIONER PRIZMICH:**  Okay, so they

18 just dropped it?

19      **INMATE SOTO:**  Correct.

20      **PRESIDING COMMISSIONER PRIZMICH:**  Okay.  And then

21 8/27/78, Montebello Police Department, you were

22 arrested.  Well, there was a Penal Code Section 242,

23 which is battery.  The disposition on this, apparently

24 you failed to do something, because there was a bench

25 warrant issued.  Is that, do you remember that, was it?

1    **INMATE SOTO:**  I assaulted someone, but I don't
2  believe I had a bench warrant at the time.
3    **PRESIDING COMMISSIONER PRIZMICH:**  That's what it
4  says here.  Did you, what did you do, get in a fistfight
5  with somebody?
6    **INMATE SOTO:**  I was actually a witness to a car
7  accident, and the person that was drunk was the person
8  that was running his mouth off at me and I popped him
9  one time in the nose.  The police showed up.  He
10  actually told the police I had assaulted him and I went
11  to jail instead.
12    **PRESIDING COMMISSIONER PRIZMICH:**  All right.
13  Anything else with regard to your arrest record, your
14  criminal history at all, sir?
15    **INMATE SOTO:**  All the crimes, they were all under
16  one sentence.  I didn't do 160 one time and then do
17  another 160 days.  They were actually all together.
18    **PRESIDING COMMISSIONER PRIZMICH:**  And that
19  doesn't look like that here, because we've got one
20  series that was in '75, and then another one in '76 when
21  they, when I speak of the 160 days.  I'm not saying this
22  is right or wrong.  I'm saying that's what I, you know.
23    **INMATE SOTO:**  Because they had just combined them
24  all together at the end and I ended up doing that amount
25  of time for the crimes that I committed.

1    **PRESIDING COMMISSIONER PRIZMICH:** How much, how

2    long were you on probation?

3    **INMATE SOTO:** Three years.

4    **PRESIDING COMMISSIONER PRIZMICH:** Okay. In terms

5    of your personal and social history, sir, I'll be

6    reading out of your psychological report. It's an older

7    one, but it's only for purposes, for my purposes for the

8    personal and social history. Your birth date was

9    5/22/57?

10    **INMATE SOTO:** Yes, Sir.

11    **PRESIDING COMMISSIONER PRIZMICH:** Okay. You were

12    born in Compton, California, is that accurate, sir?

13    **INMATE SOTO:** That's correct.

14    **PRESIDING COMMISSIONER PRIZMICH:** You attended

15    school through the 11th grade. What was your attendance

16    at school? Were you, were you, did you attend school

17    all the time or were you in and out?

18    **INMATE SOTO:** I attended school always.

19    **PRESIDING COMMISSIONER PRIZMICH:** Did you ever

20    get expelled for anything?

21    **INMATE SOTO:** Expelled one time because I had

22    long hair.

23    **PRESIDING COMMISSIONER PRIZMICH:** Okay. Your

24    parents separated at about age nine?

25    **INMATE SOTO:** Yes.

1    PRESIDING COMMISSIONER PRIZMICH:  Okay.  Are

2  they, are they, are both your parents still living now,

3  sir?

4    INMATE SOTO:  Yes, Sir.

5    PRESIDING COMMISSIONER PRIZMICH:  And what's your

6  dad's health now?

7    INMATE SOTO:  According to him he's in good

8  health.

9    PRESIDING COMMISSIONER PRIZMICH:  Okay, and what

10  about your mom?

11    INMATE SOTO:  She's still living.  She's having

12  problems right now.

13    PRESIDING COMMISSIONER PRIZMICH:  Do you have

14  interactions with them at all, sir?  Do they visit,

15  either one of them, or none of them, or all of them?

16    INMATE SOTO:  My mother, I call once a week on

17  Wednesdays and talk with her.

18    PRESIDING COMMISSIONER PRIZMICH:  Okay.

19    INMATE SOTO:  My father is three-way, I tell my

20  mom, give a message to my dad, and when they talk to

21  each other they pass along messages.

22    PRESIDING COMMISSIONER PRIZMICH:  Okay, you

23  don't, you don't talk to him too much, then?

24    INMATE SOTO:  He doesn't have a phone for me to

25  call.  He has a cell phone.

1      **PRESIDING COMMISSIONER PRIZMICH:** Okay, all

2   right. Does your mom visit here at all?

3      **INMATE SOTO:** When they find someone to drive

4   them.

5      **PRESIDING COMMISSIONER PRIZMICH:** Did you get, do

6   they both come up?

7      **INMATE SOTO:** They're waiting to come up now, but

8   they can't drive on the freeway. They have to have

9   someone bring them.

10      **PRESIDING COMMISSIONER PRIZMICH:** So both mom and

11   dad?

12      **INMATE SOTO:** Yes.

13      **PRESIDING COMMISSIONER PRIZMICH:** But they're,

14   are they remarried?

15      **INMATE SOTO:** No, Sir.

16      **PRESIDING COMMISSIONER PRIZMICH:** Okay, so

17   they're, but they're still friends, it sounds like?

18      **INMATE SOTO:** Yes.

19      **PRESIDING COMMISSIONER PRIZMICH:** Brothers and

20   sisters, how many do you have, sir?

21      **INMATE SOTO:** Now, one brother and one sister.

22      **PRESIDING COMMISSIONER PRIZMICH:** How old is your

23   brother?

24      **INMATE SOTO:** Approximately 58, 59 years old.

25      **PRESIDING COMMISSIONER PRIZMICH:** And your

1  sister, sir?

2        INMATE SOTO:  Forty-seven.

3        PRESIDING COMMISSIONER PRIZMICH:  And do they

4  visit you here, sir?

5        INMATE SOTO:  No, Sir.

6        PRESIDING COMMISSIONER PRIZMICH:  Why?

7        INMATE SOTO:  My sister, maybe once every five

8  years.

9        PRESIDING COMMISSIONER PRIZMICH:  Okay, and your

10 brother just doesn't?

11       INMATE SOTO:  No, Sir.

12       PRESIDING COMMISSIONER PRIZMICH:  Have you lost

13 contact with him, or is it, is there issues that --

14       INMATE SOTO:  We have no problems with each

15 other.  He just has his own life to live.

16       PRESIDING COMMISSIONER PRIZMICH:  Okay, where

17 does he live, in California?

18       INMATE SOTO:  Yes.

19       PRESIDING COMMISSIONER PRIZMICH:  Both of them

20 live in California?

21       INMATE SOTO:  Yes.

22       PRESIDING COMMISSIONER PRIZMICH:  You have an AA

23 degree, is that accurate, sir?

24       INMATE SOTO:  Yes, Sir.

25       PRESIDING COMMISSIONER PRIZMICH:  And you're

36

1   working towards your BA?

2          INMATE SOTO:  Not anymore.

3          PRESIDING COMMISSIONER PRIZMICH:  Not anymore?

4   What happened?

5          INMATE SOTO:  Former Governor Pete Wilson took

6   our PELL grants that we used to get.

7          PRESIDING COMMISSIONER PRIZMICH:  Okay, all

8   right.  So you got your AA under a different --

9          INMATE SOTO:  Correct.

10          PRESIDING COMMISSIONER PRIZMICH:  Okay.  Did some

11   of your, or one of your brothers pass on?

12          INMATE SOTO:  Yes, Sir.

13          PRESIDING COMMISSIONER PRIZMICH:  How did it, how

14   did that happen?

15          INMATE SOTO:  He ended up with three tumors in

16   his liver.  One of them was cancerous.  And some of the

17   cancer ended up in his spleen, and he passed away.

18          PRESIDING COMMISSIONER PRIZMICH:  That's too bad.

19   Was that recently?

20          INMATE SOTO:  Last year on Thanksgiving Day.

21          PRESIDING COMMISSIONER PRIZMICH:  I'm sorry to

22   hear that.  You're currently divorced, sir?

23          INMATE SOTO:  Yes.

24          PRESIDING COMMISSIONER PRIZMICH:  And you've been

25   married three times, is that accurate?

1      INMATE SOTO:  Yes.

2      PRESIDING COMMISSIONER PRIZMICH:  You married

3  while you were in prison?  Two of your wives were while

4  you were in prison?

5      INMATE SOTO:  Correct.

6      PRESIDING COMMISSIONER PRIZMICH:  Okay, and that,

7  you know, just out of my own curiosity, did you and your

8  two wives that failed in terms of marriage, was that

9  something you discussed, how that, how that would

10  challenge the marriage if you were in and they were,

11  they were out?

12      INMATE SOTO:  Yes.

13      PRESIDING COMMISSIONER PRIZMICH:  And it never, I

14  guess it didn't register that it might be move difficult

15  than you thought?

16      INMATE SOTO:  Well, I always lay the ground rules

17  about my situation.

18      PRESIDING COMMISSIONER PRIZMICH:  Yeah.

19      INMATE SOTO:  You know, that there's no promised

20  can be made when I'll be out, if I ever get out.

21      PRESIDING COMMISSIONER PRIZMICH:  Right, yeah,

22  but that seemed to not trouble the ladies at all?

23      INMATE SOTO:  Correct.

24      PRESIDING COMMISSIONER PRIZMICH:  Obviously it

25  did ultimately.  That's a, that's a tough row to hoe, I

1   mean, it's tough for anybody.  Any children, sir, that

2   you're aware of?

3          INMATE SOTO:  Not biologically.

4          PRESIDING COMMISSIONER PRIZMICH:  Okay, you have

5   some stepchildren?

6          INMATE SOTO:  Yes, I have two daughters.

7          PRESIDING COMMISSIONER PRIZMICH:  Okay, do you

8   have any contact with them?

9          INMATE SOTO:  Yes.

10          PRESIDING COMMISSIONER PRIZMICH:  How old are

11   they?

12          INMATE SOTO:  Autumn is 22 years old, and Olivia

13   is 19 years old.

14          PRESIDING COMMISSIONER PRIZMICH:  And they are

15   with which wife, first, second, or third?

16          INMATE SOTO:  My ex-wife, my third wife, Martha.

17          PRESIDING COMMISSIONER PRIZMICH:  Okay.  Do you

18   have any contact with Martha?

19          INMATE SOTO:  Yes.

20          PRESIDING COMMISSIONER PRIZMICH:  Does she visit?

21          INMATE SOTO:  They play on coming in a few

22   months.

23          PRESIDING COMMISSIONER PRIZMICH:  Will that be

24   the first visit?

25          INMATE SOTO:  No.

1    **PRESIDING COMMISSIONER PRIZMICH:** What about your

2    daughters?  Have they visited you before?

3    **INMATE SOTO:** Yes.  My youngest daughter, Olivia,

4    she's not a, she can't visiting me right now.  She's

5    stationed on the USS Theodore Roosevelt.  And because of

6    her job she cannot discuss many things.

7    **PRESIDING COMMISSIONER PRIZMICH:** Well, you must

8    be proud of her.

9    **INMATE SOTO:** Very proud.

10   **PRESIDING COMMISSIONER PRIZMICH:** And what about

11   your other daughter, your 22-year-old?

12   **INMATE SOTO:** Autumn.

13   **PRESIDING COMMISSIONER PRIZMICH:** Autumn.

14   **INMATE SOTO:** Yes.  Right now we have her, well,

15   now she's inside of an in-living rehab program.

16   **PRESIDING COMMISSIONER PRIZMICH:** Well, good for

17   her.

18   **INMATE SOTO:** Yes.

19   **PRESIDING COMMISSIONER PRIZMICH:** Good, well, she

20   obviously had some challenges and she's trying to work

21   through it.

22   **INMATE SOTO:** Yes, she is, and she's doing very

23   good.

24   **PRESIDING COMMISSIONER PRIZMICH:** Good for her.

25   Good.  Let me get to your substance abuse history here,

1   turn the page.  Employment history, you report a stable

2   work history in the community prior to incarceration.

3   You worked for a plastic manufacturer for several

4   months, worked four years in a sheet metal worker for a

5   truck and auto body company.

6        **INMATE SOTO:**  That's correct.

7        **PRESIDING COMMISSIONER PRIZMICH:**  That's right?

8   Okay.  Substance abuse history, a brief history of use

9   of illicit drugs.  What were the illicit drugs?  Do you

10  remember what you tried out?

11       **INMATE SOTO:**  Marijuana and PCP.

12       **PRESIDING COMMISSIONER PRIZMICH:**  Okay, any

13  alcohol, sir?

14       **INMATE SOTO:**  Yes, Sir.

15       **PRESIDING COMMISSIONER PRIZMICH:**  Did you abuse

16  alcohol?

17       **INMATE SOTO:**  The only time I would drink any

18  alcohol would be on Saturdays mostly, as I worked during

19  the week.

20       **PRESIDING COMMISSIONER PRIZMICH:**  Okay, that's

21  oftentimes how people start out that have problems with

22  it.  They start out just with drinking on the weekends.

23       **INMATE SOTO:**  That is correct.

24       **PRESIDING COMMISSIONER PRIZMICH:**  And the

25  marijuana and PCP, why those two drugs?  What was the --

1          INMATE SOTO:  At that time, back in the 1970s

2    that's all the drugs we had in that area that ever came

3    before me.

4          PRESIDING COMMISSIONER PRIZMICH:  Any heroin?

5          INMATE SOTO:  Where I lived at in that city,

6    heroin addicts were just not there.

7          PRESIDING COMMISSIONER PRIZMICH:  Okay, no

8    cocaine or anything like that?

9          INMATE SOTO:  No, I had never seen cocaine

10    before.

11          PRESIDING COMMISSIONER PRIZMICH:  So marijuana

12    and PCP, and how often would you use that, sir?

13          INMATE SOTO:  Weekends.

14          PRESIDING COMMISSIONER PRIZMICH:  Weekends, with

15    your drinking?

16          INMATE SOTO:  Yes, Sir.

17          PRESIDING COMMISSIONER PRIZMICH:  Did you ever

18    get drunk?

19          INMATE SOTO:  Yes, Sir, I've been drunk two times

20    in my life.

21          PRESIDING COMMISSIONER PRIZMICH:  And how did

22    that happen?

23          INMATE SOTO:  Over-drank, mixed beer, whiskey and

24    wine all together the same, the same night.

25          PRESIDING COMMISSIONER PRIZMICH:  Was there an

1  event going on or something?

2       **INMATE SOTO:**  One at a party and once for a

3  funeral.

4       **PRESIDING COMMISSIONER PRIZMICH:**  A party and a

5  funeral, okay, so social gatherings?

6       **INMATE SOTO:**  Yes.

7       **PRESIDING COMMISSIONER PRIZMICH:**  And when you

8  used marijuana and PCP, did you do that with people?

9       **INMATE SOTO:**  Yes.

10       **PRESIDING COMMISSIONER PRIZMICH:**  Were there

11  others, and did you ever do it by yourself?

12       **INMATE SOTO:**  No.

13       **PRESIDING COMMISSIONER PRIZMICH:**  Did you ever

14  drink by yourself?

15       **INMATE SOTO:**  No.

16       **PRESIDING COMMISSIONER PRIZMICH:**  I'm going to

17  turn your attention to Mr. Armenta now for your post-

18  conviction factors, sir.

19       **DEPUTY COMMISSIONER ARMENTA:**  Okay, Mr. Soto,

20  let's go over what you've been doing since your last

21  hearing.  Your last hearing was on January 25th, no,

22  January 12th, 2006.  You were denied for a year.  But

23  prior to that, a year earlier you did receive a date,

24  came back earlier this year in 2007 and the hearing was

25  postponed for a new psych.